## STATE OF MARYLAND v. CHAPMAN
### (three cases).
### Cr. A. 22145, 22146, 22147.

United States District Court
D. Maryland.
June 8, 1951.

336

Carlyle J. Lancaster, State's Atty. for Prince George's County, Upper Marlboro, Md., for State of Maryland for plaintiff.

Bernard J. Flynn, U. S. Atty. and Frederick J. Green, Jr., Asst. U. S. Atty., Baltimore, Md., for defendant.

CHESNUT, District Judge.

These three cases, by agreement tried concurrently, present a very unusual set of facts resulting in the unintentional death of two small children and one adult who were occupants of a house in a settlement known as Morningside, just north of the United States Air Force Base known as Andrews Field, situated in Prince George's County, Maryland, about four miles distant from the District of Columbia Line. The deaths of these three persons resulted from the abandonment of a B-25 type of aircraft belonging to the United States Government and stationed at Andrews Field.

The pilot of the plane was Captain Paul V. Chapman, a regular officer of the United States Air Force and an experienced pilot with prior service of about 1,700 hours of flying time and who had been for some years past actively engaged as an officer of the Air Force. The Grand Jury of Prince George's County indicted Captain Chapman in the three separate cases for manslaughter. Under the applicable federal statute the cases were removed to this court for trial, on the ground that the acts performed by the defendant were in the course of his official duties as a federal officer. There has been no question raised as to the propriety of this removal of the cases. They have been tried without a jury by the request of the defendant, concurred in by counsel for both parties.

 In a removal case of this nature the substantive law of the State of Maryland must be applied by the court. The procedure, however, is in accordance with federal rules. The Federal Rules of Criminal Procedure contemplate that in a case tried by the court without a jury, the court may make a general finding only or in addition, find special facts. Rule 23(c), 18 U.S.C.A. As the case is of an unusual nature, I think it desirable to state concisely the main facts established by the evidence. There is practically no controversy as to any of the facts. The question in the case is whether the facts establish a case of manslaughter.

Andrews Field was established by the United States during the last war, after condemnation of the land in Prince George's County. Since then, and possibly as a result of activities at the Air Base, a considerable residential settlement has grown up just north of the Field, consisting of nearly 400 separate houses with a population of about 1,800.

The B-25 involved in this case had been stationed at Andrews Field for a year or more prior to the occurrence of the events on April 8, 1951, which are the subject of this case. It was a bomber type of plane which had recently been in use for continued training flights by officers of the Army, mostly stationed in the Pentagon Building in or near Washington, D. C. The day before April 8, 1951, a mechanical defect had been noticed with respect to the operation of the landing gear of this plane. The landing gear consisted of two wheels at the rear of the plane and one front wheel, constituting what is called a tricycle formation arrangement. As is well known, as soon as the airplane takes off and is air borne, these wheels are retracted upwards into the body of the plane and when the plane alights they are released to form a cushion for the landing. They are actuated by cylinders which are operated with hydraulic fluid. A mechanic repaired the landing gear equipment on Saturday, April 7, and in accordance with usual practice before it was released for general flight it was necessary to ascertain by a test flight if it was in operating condition. Such a test flight for this plane was authorized in writing on April 8. Capt. Sander, an experienced pilot with 2,000 hours of flying time, was directed to make the test flight. The regulations provided that he be accompanied by a co-pilot and an engineer. On request, Capt. Chapman, who was available at the time, was asked to and agreed to make the test flight for this particular plane and two other planes which were to be tested.

On inspecting the B-25 prior to the test flight some further difficulty was noticed with respect to the operation of the landing gear. A mechanic was called to make the necessary adjustment and in the meantime Sander and Chapman and the engineer tested and found satisfactory another plane. On returning to the B-25, inspection indicated that the adjustment had been satisfactorily made. They immediately proceeded to test it. Capt. Sander suggested to Capt. Chapman that as the latter was in a measure voluntarily assuming extra duty he might prefer to act as pilot and get the credit for additional flying time, and Chapman so agreed and did act as pilot on the test flight. Almost immediately after the plane was airborne it was noticed that the landing gear did not properly retract and release. This fact was at once communicated by radio-telephone to the officer on duty in the Control Tower at the Field. He advised trying various customary pro-

cedures to overcome the difficulty. These were unsuccessful and later the Control Tower advised the plane to try so-called "violent" maneuvers, which also proved unsuccessful, but resulted in shaking down the left wheel to the landing position but causing it to be locked in that position so that it could not be again retracted; while the right wheel was only half released and could not be either retracted or fully lowered; nor could the front wheel be released. This condition of the two rear wheels was observed by the pilot and copilot on their respective sides of the plane. They concluded that the trouble was with loss or non-functioning of hydraulic fluid. The Control Tower then ordered another plane to attempt to lower a can of needed hydraulic fluid. This very difficult maneuver was unsuccessful because the rope first used was too short. The second attempt with a longer rope was later tried also unsuccessfully.

The test flight had begun at 11 A. M., and these various maneuvers had occupied several hours. In the meantime the plane had been flown over and several miles away from the Field. Chapman and Sander discussed various possibilities which the situation presented. They were in almost constant radio contact with the Tower. The latter suggested that a crash landing might be possible but both Chapman and Sander concluded on their best judgment, with their immediate knowledge of the condition of the landing gear, that this would be very hazardous. The Tower's suggestion that a crash landing might be feasible was apparently based on the supposition that the pilots were provided with shoulder harnesses, which however, they did not have. Both pilots testified that in the condition of the landing gear a crash landing would be extremely dangerous to all three occupants of the plane and likely fatal to one or more of them.

Information that a plane in the air was in serious trouble soon became known to other superior officers of the Air Force at Andrews Field and six of them assembled in the Tower and after consultation directed replies and advice to be given from time to time to the plane. It is recognized that the ultimate responsibility for final action rests with the pilot of the plane, but advice from the Tower is naturally carefully heeded and considered by the pilot.

At 3:45 P. M., the plane was near Annapolis, about 30 miles from Andrews Field, and the gas supply was running low. The pilots had lost nearly all hope of repairing the landing gear and decided to return to the Field for further instructions. On nearing the Field and coming into radio contact with the Tower the recorded messages between the Tower and the plane were as follows: The plane said: "We are five miles north of ADW (Andrews Field), 2300 feet, we are now attempting to force some gasoline into the hydraulic system in a final effort to get this gear down. We plan to abandon the aircraft, request you figure out a proper heading so that we will miss the populated area."

Tower—"ADW tower advises that after you make a final attempt to use the gasoline fly over ADW field on a heading of 120 degrees and have the co-pilot and engineer bail out."

Plane to Tower—"Repeat."

Tower—"Fly over ADW field on a heading of 120 degrees, have the co-pilot and engineer bail out."

Plane—"I understand we are to take a heading of 120 (garbled) is that roger?"

Tower—"Negative, 395, what we would like to have you do is fly directly over the ADW field and on the first pass have the co-pilot and engineer bail out. The pilot will take the airplane around and come in on a heading of 120 degrees, trim the airplane and the pilot will bail out on the second pass on a heading of 120 degrees over Andrews."

The two pilots concurred in and acted on this advice. None of the three occupants of the plane had ever previously attempted a parachute landing but the parachutes were, in accordance with regulations, attached to their bodies. Chapman, the pilot, did as he was advised. The co-pilot and engineer bailed out of the plane and after the pilot performed the circling motions as advised, he also abandoned the

plane. All three landed safely with only minor injuries.

The standard operations procedure at Andrews Field provided that if it became necessary to abandon a plane in the Washington area, the pilot should first set the plane on a compass course of 140 degrees which, counting the north as zero, would tend to continue the flight of the airplane in a generally southeasterly direction over a sparsely populated area. When, in accordance with the above recited communications between the plane and the Tower the Tower advised that in this particular instance when the plane was abandoned it should be set on a course of 120 degrees, the expectation was that it would in its continued flight proceed in a generally southeasterly direction toward the Chesapeake Bay which was about 15 miles away and which would be reached in normal flight in about 7 or 8 minutes. Simultaneously the Tower gave orders to two jet planes to follow the abandoned B-25, and when it reached over the Chesapeake Bay, as expected, to shoot it down.

There was a reasonable expectation on the part not only of the pilot and co-pilot of the B-25, but also by the superior Air Force officers stationed in the Control Tower (many of whom testified as witnesses in this case to that effect) that the plane would so continue on its charted course. This expectation was based on their prior experience with B-25's which they, or some of them, had personally piloted for some minutes at a time without the pilot touching the instruments at all after setting the course. The unexpected development in this case was that after the pilot had set the course and carried out other instructions from the Tower and abandoned the plane, the latter after proceeding only a very short distance on the course set, began to swerve or circle to the left and finally came to the ground about 200 feet from the house which was finally struck with great force and set on fire and apparently completely destroyed, with the lives of the three occupants. This erratic course of the plane was unexpected and is entirely unexplained.

More specifically I find with respect to the facts—

■ 1. The judgment of the pilots that a crash landing would be extremely dangerous if not fatal to all three occupants of the plane was well founded and highly probably correct. And this also seems to have been the judgment of the six officers in the Tower after learning the full conditions and exhausting the possibility of repairing the landing gear. The great danger in a crash landing with the landing gear in its condition was that on landing the airplane would "cartwheel" and probably turn over and catch on fire. It would not have been reasonably possible for the co-pilot and engineer to bail out leaving the pilot alone to attempt a crash landing in view of the numerous things that would have to be done by him alone at that time. A crash landing in the Chesapeake Bay with all three occupants of the plane was likewise rejected because the plane was not equipped with water life-saving devices of any kind, and from experience the pilots thought that impact with the water would probably cartwheel the plane and cause their drowning.

2. It is not contended by the State that the defendant had any intention to kill or harm any of the three decedents or any other persons. In the emergency situation which developed in the plane during the five hours that it was in the air, and in the difficult alternatives which had developed and were carefully considered by the pilots, it is not surprising that in their final action they elected to abide by the advice of the Control Tower as to the time for and the method of abandoning the plane.

The most serious contention of the State is that the pilot himself should not have abandoned the plane over Andrews Field but, after the co-pilot and engineer had left the plane over the Andrews Field, the defendant as pilot should have kept on in the plane and abandoned it only after it was safely away from the populated area of Morningside. At least with regard to future action, the contention is certainly a reasonable one in the interest of the safety

340

of the citizens of Prince George's County. And it is to be noted that the standard operations procedure (S.O.P.) has been amended since this occurrence, and doubtless in the light of the experience gained thereby, so that there is added to the procedure, in the case of an abandonment of an airplane in or around Andrews Field, the following:

"To proceed toward the Atlantic Ocean area and abandon the aircraft at such altitude and attitude as to preclude return trip to populated area."

It appears from these facts that at the time the airplane was abandoned by the defendant as pilot, the situation that existed was (1) a crash landing would certainly imperil the life of the defendant; (2) it was therefore imperative that the defendant should abandon the plane by the only means available to him, a very risky one at that, of landing by parachute; (3) that every possible effort had been made to avoid this ultimate situation; (4) that in abandoning the plane the pilot, in addition to his own judgment, and that of his copilot, thought it necessary to do so; (5) that this judgment was confirmed by the advice, if not instruction, of the six superior officers in the Control Tower; (6) that it was the reasonable expectation of all of them that the plane would continue on its southeasterly course for at least some miles into the sparsely occupied territory where it was highly improbable that any one's life or property would be endangered.

■ Counsel for the State does not seriously dispute these facts but maintains that there was at the moment of final abandonment no immediate urgency or necessity for the plane to be abandoned by the pilot over Andrews Field which was in proximity to the populated area north and that therefore the pilot should have known or realized that it was dangerous to human life to abandon the plane at that time and place. This is the real question in the case. On the other hand, hindsight is proverbially better than foresight. It was said during the trial that there was no prior instance on record where an airplane abandoned by the pilot had resulted in serious danger to life of persons on the ground. As a result of the experience in this case the standard operations procedure has been further amended as above stated for further future safety. Should it be held in this case that the defendant should have reasonably anticipated the probability that the plane would circle and swerve, as it did, back into an area almost directly opposite to the course on which it was set when the pilot abandoned it? The burden of establishing an affirmative answer to this question beyond a reasonable doubt is on the prosecution. After careful consideration, I have concluded that it has not been so established.

As this is a prosecution by the State of Maryland in a case removed from the State Court, the controlling substantive law of manslaughter is that to be found in the Maryland law, either statutory or judicial decisions of the Court of Appeals. Owing to the peculiar Maryland constitutional provision that in criminal cases the jury are to be the judges of the law as well as of the facts, and the almost uniform practice until very recently prevailing that the judges do not instruct juries as to the law in criminal cases, there have been few decisions of the Maryland Court of Appeals, at least since the Constitution of 1851, which have dealt with the principles of the substantive criminal law.

■ However, it has been provided in the basic Maryland law from the earliest days of independence that the citizens of Maryland are entitled to the benefit of the common law and the principles of common law of crime, when not affected by statutes in particular States, are well established. In the case of Neusbaum v. State, 156 Md. 149, 155, 143 A. 872, 875, the court, speaking of manslaughter (in a case of manslaughter by driving an automobile) said: "Manslaughter has been defined to be 'the unlawful and felonious killing of another, without malice aforethought, either express or implied, and is either voluntary or involuntary homicide, depending upon the fact whether there was an intention to kill or not'."

In the instant case it is conceded that the defendant had no intention to kill or harm anyone. Obviously, therefore, the case if

one of manslaughter at all, is one of involuntary manslaughter.

Continuing in the opinion in the Neusbaum case, Judge Offutt said: "A felonious homicide is where one takes the life of another human being 'purposely and without legal excuse, or without such excuse takes it unintentionally while needlessly doing anything in its nature dangerous to life, or who causes death by neglecting a duty imposed either by law or by contract, or in the course of committing a crime or even a civil wrong'."

Judge Offutt refers for authority to Wharton's Criminal Law and to Bishop on Criminal Law, both well known text books upon the subject. The pertinent part of the quotation as applicable to this case lies in the phrase "without such excuse takes it unintentionally while *needlessly doing anything in its nature dangerous to life*". (Italics supplied.) In the instant case the defendant was in the course of performing perfectly lawful and indeed required official duty, and it is admitted that he had no intention to cause harm to anyone; nor do I think it can be said under all the facts that he was knowingly *needlessly doing anything in its nature dangerous to life.*

The only Maryland statutes which would seem to have any significance in this case are those which deal with manslaughter by automobile, by motor boat, or by other named vehicles (possibly broad enough to include airplanes) in Flack's 1947 Annotated Code, Art. 27, § 436A and Art. 99, § 108A, both of which include as an essential element of the offense "gross negligence" on the part of the operator.

 Again it is to be importantly noted that in considering the subject of what constitutes negligence, we must distinguish between its application in cases involving civil liability and those, as in this one, involving alleged criminal liability. We are not dealing here with a civil case and it is therefore quite unnecessary to determine whether the injuries caused by the abandonment of this plane constituted a civil liability of any one. In my view the law is reasonably clear that a charge of manslaughter by negligence is not made out by proof of ordinary simple negligence that would constitute civil liability. In other words, the amount or degree or character of the negligence to be proven in a criminal case is *gross* negligence, to be determined on the consideration of all the facts of the particular case, and the existence of such gross negligence must be shown beyond a reasonable doubt. If the resultant deaths were merely accidental or the result of a misadventure or due to simple negligence, or an honest error of judgment in performing a lawful act, the existence of gross negligence should not be found.

In a succinct and well prepared brief counsel for the State has aptly expressed the matter in saying that the question is whether the conduct of the defendant, considering all the factors of the case, was such that it amounted to a "wanton or reckless disregard for human life." On the facts I conclude that the defendant's action was neither wanton nor reckless, and because the State has not established beyond a reasonable doubt that it was, the verdict must accordingly be Not Guilty. The clerk is therefore instructed to enter that judgment.