# SAMUEL WAYNE BOYD v. STATE OF MARYLAND

[No. 899, September Term, 1973.]

*Decided August 21, 1974.*

540

The cause was argued before ORTH, C. J., and POWERS and MOORE, JJ.

*Stephen L. Snyder* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Frank A. Sauer, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court. POWERS, J., dissents and filed a dissenting opinion at page 554 *infra.*

On June 11, 1972, at approximately 3:10 A.M. in the City of Baltimore, 2 teen-aged youths — a boy 16 and a girl 15 — were struck by appellant, then age 20, as he neared his home, driving a 1966 Plymouth Valiant, after a long night of bowling with his younger brother at Colt Lane Bowling Alley. The boy was dead upon arrival at Lutheran Hospital at 3:30 A.M.; the girl was pronounced dead at the same hospital on June 14, 1972 at 12:30 P.M.

Convicted in a bench trial in the Criminal Court of Baltimore of manslaughter by automobile and of several traffic violations (reckless and negligent driving, speeding, failure to give information and render aid), appellant received maximum concurrent sentences of 3 years under each of the manslaughter charges and concurrent therewith, 2 months concurrent sentences on each of the traffic violations.

On appeal Samuel Wayne Boyd questions the sufficiency of the evidence to sustain his conviction of automobile manslaughter. He also contends the trial judge erred in

permitting a witness, Nelson Jackson, who was driving his car behind appellant's vehicle, to testify that appellant was driving in excess of 60 miles per hour. Finally, it is claimed that the sentence was excessive under the circumstances.

I

The State's case was presented through the testimony of the above witness, Nelson Jackson, described by the court as "highly credible and competent," and two police officers. It was developed that Mr. Boyd was driving west bound on Gwynns Falls Parkway to his home at 2604 Denison Street which intersects the Parkway from which he would ordinarily turn right to Denison. His 17 year old brother occupied the front passenger seat but had his head down because he was tired. The Parkway has a 38 foot grass center and the east and west bound lanes are of the same dimensions. The lane next to the center is 10 feet wide and the so-called curb lane is 16 feet — wide enough to accomodate two passenger cars. Next to the curb is a 5 foot section of grass, then a 5 foot sidewalk from which the front lot line of the houses is six feet.

Witness Jackson was driving his own car on Gwynns Falls Parkway enroute to visit a friend, shortly after 3 A.M. He was employed as an MTA bus driver, and had been for $3^1/_2$ years. Prior to that, he worked at Chevrolet General Motors and drove a taxicab part time for the Yellow Cab Company. He was a licensed operator for about ten years and testified that he drove every day.

At Gwynns Falls near Longwood, a light blue vehicle "pulled out almost in front of me," he testified, and started up Gwynns Falls in the left lane, then in the middle of both lanes until it reached Longwood where it occupied the right lane, and stopped for a red light. As he came alongside and also stopped for the light, Mr. Jackson looked over at the driver and noticed that he was wearing sunglasses and that he had a passenger. He also heard "gunning of the motor." When the light turned green, the other driver "took off pretty fast." Between Longwood and Hilton, the next traffic light, the other vehicle was about one-half block ahead of

Jackson. The posted speed limit was 30 miles per hour. Jackson said his own speed was about 40 miles an hour. The light at Hilton, red as they approached, turned to green and the car in front proceeded on as did Mr. Jackson.

Approaching Denison, in the left lane, Mr. Jackson observed two children — "two obstacles, really, from my first observation, coming off the median strip." The other car was approximately at the corner of Denison, less than one-half block from the children who had come off the median area and were walking across the Parkway in the middle of the street. Cars were parked at the curb and the car ahead (appellant's) was in the lane next to them. Jackson himself started applying his brakes. The vehicle ahead did "nothing at all except for continuing on up Gwynns Falls." He testified:

> "Then as I seen the children they were about in the second lane, in other words, in the curb lane, the vehicle continued on and struck the children, the two children before they could get in between the two cars, you know, before they could get between the parked cars."

Mr. Jackson turned his vehicle right, into Denison Street and got out. The other vehicle, he stated, backed away from the curb about a half block away from the place of the accident and continued on. The witness got back into his car and drove around the block where he encountered a policeman to whom he reported what had happened. The witness was then asked the following question, to which appellant interposed an objection:

> "BY MR. SAUR: Do you have an opinion as to the speed of this automobile when it was traveling west bound in Gwynns Falls Parkway just prior to striking the pedestrians?"

The court then afforded appellant's counsel an opportunity to cross-examine the witness "on his qualifications to give such an opinion" but it was declined. Counsel stated he had

no objection to what the witness observed, but he did object "to a specific rate of speed."

The question was thereafter rephrased, as follows:

"BY MR. SAUR: Now, let me ask you this: Based on your observations of the vehicle, and its movements, and upon your experience as a driver, do you have an opinion as to the speed of this vehicle just prior to striking the victims? "

When the question was further amended to state "within a few feet" prior to the striking of the pedestrians, the witness answered: "My opinion is the speed was at least 60 miles per hour."

Dispatched at 3:10 A.M., an officer from the Traffic Investigation Section with 18 years experience in the Department and 4 years in the Section, arrived at the scene at 3:16 A.M. According to his observations and measurements at the scene, the point of impact was 70 feet west of Denison Street and 10 feet south of the north curb line. The body of the male pedestrian was 198 feet west of Denison Street (128 feet from the point of impact) and the body of the female was 126 feet west of Denison Street (56 feet from the point of impact).

(The official autopsy records, received in evidence by stipulation, revealed that one victim was a Negro male, age 16, five feet nine inches, 129 pounds and that he was wearing a red and white shirt and lavender trousers. The second victim was a Negro female, age 15, five feet seven inches, 112 pounds.)

There were four parked cars in the immediate area. The rear window of one of the vehicles had been knocked out when it was struck by the body of the female pedestrian.

The investigating officer observed no skid marks in the street "that would be fresh or coming from a very recent accident." Nor did he notice any centrifugal rub marks. It was a clear, dry night. The area is residential. There were trees at the scene but he did not consider them to be a "heavy tree growth." With respect to lighting, the officer

testified that an overhead arc type lamp was located on Gwynns Falls Parkway on the northwest corner of Denison Street and one also on the southwest corner of that intersection; lights were also located "just west of the intersection at approximately 70 feet west of the place where the accident occurred."

On the north side of Alto Avenue, east of Denison, the officer located a damaged parked vehicle — "fresh damage, pedestrian type," to the right front, leakage to the radiator and the hood warm. Photographs of the vehicle, immediately taken by him, were received in evidence. At the scene, he also received a report that the car was titled to Adline L. Boyd, appellant's mother. The vehicle was again examined by the officer after the measurements had been taken at the scene. The brakes were checked and the pedal "appeared to be solid." He described the damage as follows:

> "The damage was to the right front bumper, hood, grill, the fender, the head lamp was broken, and the right side of the front windshield was cracked, and the windshield post — a section going up holding the window — was bent, and also damage on the right front door [and] an aerial was missing from the car."

At 3:38 A.M., some twenty minutes after the officer had been on the scene, a young man (who later identified himself as appellant, Samuel Wayne Boyd) came up to the officer and said: "You are looking for me. I struck the boys." The officer stated, on cross-examination, that when he saw appellant, he did not observe any signs of drinking. When appellant later gave a voluntary statement at the Traffic Investigation office at 5:15 A.M. he was "cooperative; " and also, "he acted as a gentleman."

Appellant's written statement was read into evidence, without objection, on cross-examination of the police officer. In it appellant stated that his speed was 40 to 45 miles per hour; that there was no traffic in front or in back of him for 4 or 5 blocks from the scene of the accident. He "did not see

the pedestrians until [I was] 4 or 5 houses past Denison Street." The statement continued:

"... then I saw the young boys coming from my left to my right. When I saw the boys, I applied my brakes and turned my steering wheel to the left, but the car came back to the right and I struck the two pedestrians. My car then went cross ways on Gwynns Falls and I panicked, and then went west on Gwynns Falls to Garrison to Alto Road to Denison, made a right turn, and stopped in front of my house, that's 2604 Denison Street, and then backed up and parked at Denison Street and Alto, and went into the house. I was going to bed but had to go back to the scene as I didn't know what happened to the boys, and my conscience was bothering me.

"I asked him, 'Was there any other vehicle that pulled next to you at any red lights on Gwynns Falls? ' He stated, 'No sir.'

"I asked him, 'Have you been drinking anything tonight?' and he stated, 'No, nothing.' "

Testifying in his own behalf, appellant stated that he did not see the decedents coming from the median. When he first saw them, they were in the street and he was 4 or 5 feet "close to them." He applied his brakes, he said, and as to what then happened, he testified on direct:

"Well, I hit them; my car swerved on an angle in the middle of the street; my brother got out of the car and looked at the front of it and was all bent up; the glass of the windshield was all messed up; I backed up, went around the corner, came down Alto Road, came in front of my house, pulled back from my house up to Alto Road and Denison, and parked the car there; then I went in the house and I went upstairs in my bedroom, I sat there approximately two or three minutes, and my conscience just started bothering me, I had to go back down there

to see what was happening. Nothing like that had
ever happened like that before, and I had to go
back. I just couldn't sit down there, I had to go
back."

To a question by the court, he replied that he did not know
how fast he was going. Earlier, he testified that he
"thought" his speed was 40 or 45 miles per hour — that he
"could have been going sixty" but did not believe so.

On cross examination he conceded that he "could have
been" gunning his motor at the first traffic light. Questioned
by the State as to how he applied his brakes before the
impact, he answered:

"Well, I didn't apply them not as hard as usual, but
I did put them on when I saw them, by the time I
had just attempted to slam on the brakes, you
know, I had impact, so it wouldn't have really made
any difference whether I put them on real hard or
not, it was just too late, I just didn't see them; it
wouldn't have made that much difference."

On direct examination he had testified there was a
restriction for glasses on his operator's permit and that his
sunglasses were also prescribed glasses. The State thereafter
elicited the admission from appellant that "sometimes" the
sunglasses tend to make things darker, including
"sometimes" at night. He gave no explanation for not
wearing regular glasses on the occasion of the accident,
except that " [s]ometimes I drive at night with the
sunglasses on."

Under questioning by the court, he admitted that he
would usually turn right on Denison going to his home.
Asked "why was this night different from the other times
when you would generally turn right on Denison," he
replied: "I can't answer that, your Honor, I am sorry." (It
was in the block between Denison and Garrison that the
fatal accident occurred.)

Appellant's 18 year old brother, with whom he had been
bowling from 8 P.M. until the closing of the bowling alley at

2:30 A.M., told the court that he was riding in the front passenger seat, with his eyes closed, but not asleep, just before the accident. "I had my head down," he stated, and looked up when "my brother applied the brakes." Looking up, he saw the pedestrians on the passenger's side of the car. When the car struck the pedestrians,

> "[i]t turned on an angle, and then I got out of the car, I jumped out the car and went to the front of the car, and I looked at the car, then I looked to see if the pedestrians were lying on the ground anywhere, and I didn't see them anywhere so I got back in the car and we came on home.
>
> "Did your brother say anything in the car?
>
> "When I got back in the car, he said, 'Oh, my God.' You know he was excited, he had panicked."

## II

The contention of appellant that Mr. Jackson's testimony concerning the speed of appellant's vehicle was improperly admitted, must be rejected. While it is observed in the leading case of *People's Drug Stores, Inc. v. Windham*, 178 Md. 172, 12 A. 2d 532 (1940), cited by both appellant and appellee, that under Maryland law a witness may not fix the speed of a moving automobile " 'as so much per hour,' 'without having shown some special knowledge which would enable him to speak as an expert' ", nevertheless, it is the meaning of the term "expert" that is of critical importance. That an experienced licensed operator of an automobile may give such an opinion was made abundantly clear by Judge Offutt, writing for the Court (178 Md. at p. 182):

> "But it is obvious that in using the term 'expert' in *State v. United Rys. Co.*, *supra*, the court did not have in mind only a person who had specially trained himself by study and observation to estimate the speed of moving objects, but rather any one who had, by actual personal experience, become familiar with the operation and speed of

automobiles, whether his knowledge was gained through the personal operation of automobiles for business, or for pleasure, or as a traffic officer, or through experience in estimating the speed of moving automobiles operated by others (*Hopper, McGaw & Co. v. Kelly, supra*), for in the operation of an automobile over public highways for any purpose the driver must, to obey the traffic laws, constantly note its speed, and as well the speed of other automobiles which pass it, or which it passes, in terms of miles per hour, and so gain experience which should qualify him to estimate in such terms the speed of a moving automobile which he has observed. And ordinarily such evidence is not only the best but the only evidence available."

This definition was followed in *Miller v. Graff*, 196 Md. 609, 78 A. 2d 220 (1951) where an eyewitness testified that a taxicab was traveling at a speed of about 45 miles per hour. Judge Delaplaine there observed (p. 617):

"But by 'expert' we do not mean only a person who has specially trained himself to estimate the speed of automobiles, but rather any person who has become familiar with the operation and speed of automobiles by personal experience."

And in *Mulligan v. Pruitt*, 244 Md. 338, 223 A. 2d 574 (1966), the testimony of a housewife with five years' experience as a licensed operator, that the vehicles involved were going 30 to 35 miles per hour, was held properly admitted by the trial judge.

So in the instant case was Mr. Jackson's testimony properly admitted. As previously noted, he had been a licensed operator for at least 10 years, was a bus driver at the time of the accident and had also driven a taxicab. He was entirely justified in stating: "I feel that I have a pretty accurate account of speeding." Moreover, when asked by the court the basis for his opinion, he replied:

"On the fact the way the position was of my car

at the time; the way he went that much faster; and that far ahead of me; and I was doing about forty miles an hour; so, that is what I am basing it on."

*See, Tefke v. State,* 6 Md. App. 139, 250 A.2d 299 (1969).

### III

The crime of which appellant was convicted in both cases is the statutory misdemeanor of "manslaughter by automobile." Code, Art. 27, § 388 (1973 Cumulative Supplement). The gist of the crime is causing the death of another by driving in a "grossly negligent manner." Appellant contends that the evidence was insufficient to establish his guilt.

The test of the sufficiency of the evidence in a criminal case, frequently stated in the decisions of this Court, was stated by Chief Judge Orth in *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331, 335 (1970) as follows:

"To be sufficient in law to justify a conviction, the admissible evidence adduced must show directly, or circumstantially, or support a rational inference of, the facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

In a non-jury case, as a reviewing Court on the law and the evidence, we are bound by the provisions of Maryland Rule 1086 which mandates that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." As the Court stated in *Nichols v. State,* 5 Md. App. 340, 247 A. 2d 722 (1968) at 352:

"Our function is not to determine whether we would have come to a different conclusion from that of the lower court nor need we be convinced beyond a reasonable doubt of the appellant's guilt; we determine whether the lower court was clearly wrong in reaching a verdict of guilty on the evidence."

The Maryland statute relating to manslaughter by automobile was enacted in 1941 and has been interpreted and applied by the Court of Appeals in eight cases, all cited and reviewed by Anderson, J. (now retired) for this Court in *Montague v. State*, 3 Md. App. 66, 237 A. 2d 816 (1968), and to which a further general reference was made in another opinion by Judge Anderson in the last case before this Court involving manslaughter by automobile, *Tefke v. State*, *supra*.

It is abundantly clear from the cases that the General Assembly of Maryland imported into the Code the common law concept and meaning of gross negligence. Proof of simple negligence will not support a conviction of manslaughter. Whether the statutory standard "in a grossly negligent manner" has been violated depends upon "whether the conduct of the defendant, *considering all the factors of the case,* was such that it amounted to a 'wanton or reckless disregard for human life.' "[1] (Emphasis added.)

In this case, the trial court delivered from the bench a clear and comprehensive oral opinion which commenced with a declaration of the above standard as set forth in *Montague, supra,* and with quotations from the opinion of Judge Hammond (now retired Chief Judge) in the leading case of *Duren v. State*, 203 Md. 584, 102 A. 2d 277 (1954).

The factors properly discerned by the trial judge from the decided cases as directly relevant to the issue of guilt or innocence in a manslaughter by automobile case included:

(a) drinking (the Court making it clear from the record that there was no evidence of drinking in this case); (b) failure to keep a proper lookout and to maintain proper control of the vehicle; (c) excessive speed *"under the circumstances;"* (d) flight from the scene without any effort to ascertain the extent of the injuries; (e) the nature and force of the impact; (f) unusual or erratic driving prior to impact; (g) the presence or absence

---

1. This was the test enunciated by Judge Chestnut in State of Maryland v. Chapman, 101 F. Supp. 335, 341 (1951) and consistently followed by the Court of Appeals and this Court.

of skid marks or brush marks; (h) the nature of the injuries and the damage to the involved vehicle or vehicles; (i) the nature of the neighborhood, the environment where the accident took place. (Emphasis by trial judge.)

Carefully reviewing the facts, the trial court stated its findings which we summarize as follows:

1. From the credible testimony, it was abundantly clear that appellant was traveling not only beyond the posted speed limit "but at a rate which was, in fact, excessive under all the circumstances."

2. Based upon the testimony of Nelson Jackson, whom the court characterized as "not only a credible witness" but a "highly competent witness . . . whose business is driving," appellant was (a) guilty of erratic driving as he proceeded along Gwynns Falls Parkway; and (b) failed to keep a proper lookout. Said the court — "Jackson saw these two young people step off the median strip and walk across Gwynns Falls Parkway. They were not running. They were not darting out between parked cars . . . in fact he [Jackson] saw them cross the entire length of the land next to the median strip which is about ten feet wide . . . had travelled nearly the distance of this rather wide street. He saw all this and also saw that Mr. Boyd never slowed, he never applied his brakes until practically the point of impact and then . . . if there was an application of the brakes, it was not even enough to leave a skid mark or a rub mark."

3. The nature and force of the impact was shown by the photographs depicting extensive damage to appellant's vehicle; by the distance the body of the male victim was propelled and the fact that the female was "thrown with such force that she struck the rear window of the parked car . . . it was broken

and from that point she was propelled over to the sidewalk."

4. Had appellant looked and been attentive, he would have seen the victims. They had "practically crossed the street in [his] direct vision." The weather was warm and dry. The male, transported to the morgue in the clothes he was wearing at the time of the accident, had on a short-sleeve white and red shirt, lavender velvet pants and white socks and "must have stood out very prominently."

5. The accident occurred on a main thoroughfare in a residential area — "not a side street dimly lighted." The photographs taken by the police officer of the point of impact showed an arc light "very close to the point of impact, shining right down in the area."

6. Appellant was not aware that he had struck the victims. "It is found as a fact, a significant fact ... his car went to the curb, it stopped; his brother got out to look, not at the people who had been injured, but at the car that had been damaged ... his reflex was to take off ... he backed his car from the curb, took off and went on his way."

7. Part of the totality of the circumstances is that the appellant resided on Denison Street, a short distance from Gwynns Falls Parkway and ordinarily would turn right on Denison to reach his home. The "probability" for his not doing so is that "it was lack of attention to what he was doing ... he went by it, just not paying any attention." [2]

We conclude that the evidence was sufficient to sustain the court's finding that appellant's conduct amounted to a "wanton or reckless disregard for human life," and that the trial court was not clearly erroneous in holding that appellant's automobile was operated in a "grossly negligent

---

2. Another fact, not adverted to by the court, was appellant's use of sunglasses while driving at night.

manner" as that term is defined in *Montague v. State, supra,* and the cases there cited.

IV

We must also reject appellant's contention that the concurrent sentences of the maximum 3-year penalty for manslaughter by automobile were excessive and constituted an abuse of judicial discretion.

Almost two months elapsed after his conviction before appellant came before the court for sentencing. The court had ordered a report of presentence investigation. This report disclosed appellant maintained steady employment with Bethlehem Steel since his graduation from high school in 1969. He resided at home with his mother and father and had no criminal record. Character testimony had been received on his behalf at the trial from the minister of his church and a neighbor. It was recommended to the court that he be placed on probation with a condition that he not operate a motor vehicle.

It was also disclosed to the court, however, that appellant had been convicted in 1971 of exceeding the speed limit by ten miles under circumstances where his speed was 70 miles an hour in a 30 mile zone. As a result, he attended a driver clinic course which he completed in April, 1971. Judge Jones noted that he had not learned a lesson from that experience and apparently failed to comprehend that "the automobile can become a lethal weapon — and that is precisely what happened in this case."

It is well settled that a sentence within the statutory limits imposed after conviction of a criminal offense is within the discretion of the trial judge and will not be disturbed by this Court, absent a showing that the trial judge was influenced by ill will, passion, prejudice or some other unworthy motive and not by a sense of public duty. *Johnson v. State,* 9 Md. App. 37, 262 A. 2d 325 (1970). We find no abuse of discretion here.

*Judgments affirmed; appellant to pay the costs.*

554

*Powers, J., dissenting:*

I am satisfied that as a matter of law the evidence in this case is not sufficient to support the convictions of the appellant of manslaughter by automobile. I would reverse the judgments of conviction on those charges, but I would affirm the judgments on the traffic charges.

The opinion evidence of the eyewitness estimating the speed of appellant's vehicle was properly admitted. There was no error in that ruling by the trial judge. Nor is there any intimation in the record that the sentences imposed were influenced by ill will, passion, prejudice, or any other unworthy motive.

My disagreement with the majority, and with the trial judge, is confined to the question of sufficiency to convict of manslaughter. Let us clearly understand that the sufficiency of evidence to submit the question of guilt to the finder of facts is a question of law. If a court's ruling on any question of law is not right, it is wrong. When a ruling involves the exercise of discretion, the range within which a ruling may be right is equal to the permitted range of discretion. But the law gives no judge or court discretion to make a wrong ruling.

The "clearly erroneous" measure which under Maryland Rule 1086 we apply to the factual conclusions of a trial judge on the evidence in a non-jury case has no application to the legal rulings of that same judge in the same case. It is the weight of the evidence and the credibility of the witnesses which are left to the determination of the trial judge in a non-jury case, subject to reversal on appeal only when clearly erroneous. But a ruling on a matter of law has no such insulation from appellate reversal. Sufficiency of evidence is not a conclusion of fact, it is a matter of law.

I take the facts, as the court is required to do in testing sufficiency, in the light most favorable to the State. Let us examine the law. In its statutory source, the law is stated simply. The crime of manslaughter by automobile is "causing the death of another as the result of the driving, operation or control of an automobile * * * in a grossly

negligent manner". Code, Art. 27, § 388. Judge Moore correctly points out in his opinion for the majority that "in a grossly negligent manner" means "conduct of the defendant, considering all of the factors in the case, which amounts to a wanton or reckless disregard for human life".

Whether "all of the factors" in any particular case cause any individual judge to conclude that they may, if believed, and given permissible weight by the finder of the facts, add up to a "wanton or reckless disregard for human life", requires an evaluation not altogether free of subjectivity. For the best available guide to maximum objectivity, I shall review the "factors" present in the cases in which the Court of Appeals and this Court have ruled upon the sufficiency of the evidence to support a conviction of manslaughter by automobile.

The Court of Appeals has held the evidence sufficient in these cases:

*Hughes v. State,* 198 Md. 424, 84 A. 2d 419 (1951).

Defendant worked in a family owned non-union coal mining operation. Coal miners picketing the nearby George's Creek Coal Company drove nails in the tires of defendant's truck while he was parked there. On leaving, he approached a group of pickets standing off the road near a parked car. Defendant increased his speed, and swerved his truck several feet off the road toward the men. He apparently attempted to swerve back toward the road, but the rear of his truck did not respond, and hit the parked car and two men who were against the car. One of the men died of his injuries. The Court felt that the defendant, driving in daylight on an unobstructed road, showed a wanton or reckless disregard for human life when he intentionally swerved his truck toward the men on the side of the road.

*Duren v. State,* 203 Md. 584, 102 A. 2d 277 (1954).

Defendant was driving at least 60 miles an hour, at 7:00 P.M. on Fremont Avenue at its intersection with Laurens Street, a heavily congested residential and business area in the City of Baltimore. He left skid marks of 72 to 89 feet in length before striking the victim, a pedestrian. The Court

noted the length of the skid marks, both before and after impact, and that the force of the impact was sufficient to throw a human body high and far enough to land on the trunk of another car a number of feet away. It noted that the defendant was driving at this speed on a city street in a populous residential and business area at a time when citizens afoot and in cars were likely to be on the street. The Court held this evidence sufficient to justify a finding that driving on a city street at a speed so grossly excessive that the car was beyond effective control was a wanton or reckless disregard for human life.

*Clay v. State*, 211 Md. 577, 128 A. 2d 634 (1957).

Defendant increased speed and passed another car at an intersection, and hit a pedestrian who was in the crosswalk. He had attended a party, and had been drinking, but there was no evidence of his degree of intoxication. The accident happened around 1:00 A.M. at the intersection of Central and Ashland Avenues in downtown Baltimore. There "was traffic coming up and down", and "people crossing the street". The defendant fled the scene, and was arrested the next day. The body of the victim was found 108 feet from the crosswalk. The Court said that flight was "relevant to be considered by the tribunal trying the facts as bearing upon guilt". The Court stressed passing recklessly at an intersection, striking a pedestrian in a crosswalk, excessive speed under the circumstances, driving while drinking, and flight, as sufficient to justify a finding of wanton or reckless disregard for human life.

*Lilly v. State*, 212 Md. 436, 129 A. 2d 839 (1957).

This two vehicle collision, killing defendant's passenger, happened at 3:30 A.M. at the intersection of Eastern Avenue and Bouldin Street, in Baltimore City. Defendant, driving between 50 and 60 miles an hour, entered Eastern Avenue without stopping, as required by a stop sign there, and collided with a bus. Defendant had been drinking. A police officer said the defendant did not know what happened, did not know where he had the accident, nor where he had been. The Court held the evidence sufficient.

*Pierce v. State*, 227 Md. 221, 175 A. 2d 743 (1961).

This case dealt primarily with the question of whether the facts proved the *corpus delicti* of the crime of manslaughter by automobile, so as to make the defendant's admission that he was the driver and had been drinking, admissible. Defendant was one of the two occupants of the car. The other was killed. The car was driven at 90 to 100 miles an hour, failed to stop at a stop sign, attempted to turn without slowing, went through a steel guard rail, and came to rest against a tree. The Court held that this evidence supported a finding of guilt.

*Abe v. State*, 230 Md. 439, 187 A. 2d 467 (1963).

The evidence showed not only excessive speed, but drinking, and proceeding in the wrong lane in violation of law. Recognizing that speed alone may not be sufficient, the Court noted the additional factors and held that under all the circumstances the evidence was sufficient.

*Wasileski v. State*, 241 Md. 323, 216 A. 2d 551 (1966).

There was corroborated evidence that the defendant had been drinking quite heavily. He was driving at 5:30 P.M. in July, on Route 40, east of Cumberland. He was "flagrantly violating the Maryland traffic laws by driving on the wrong side of the road", where he sideswiped one oncoming car and crashed into the next, killing a passenger. The Court held this evidence sufficient to show a wanton or reckless disregard for human life.

This Court, in two reported opinions, has held evidence sufficient to convict of manslaughter by automobile. They are:

*Montague v. State*, 3 Md. App. 66, 237 A. 2d 816 (1968).

At 7:30 A.M. the defendant was observed driving "pretty fast" north on Route 1, swerving from the slow to the fast lane, going back and forth "like somebody playing with the wheel". The car then "shot straight away" and crossed the center line and struck a car in the southbound slow lane. The defendant got out of his car, covered his face, and, accompanied by his woman passenger, ran from the scene. Defendant's car left no skid mark leading to the point of impact, but left a side skid mark away from the impact for

140 feet. About a half hour before, defendant had been stopped by a State Trooper for weaving. He had no driver's license, and had been drinking. The Trooper gave him a ticket and directed him not to drive, but to take a cab or a bus home. The defendant never admitted that he was driving the car at the time of the collision, but he was identified by two eyewitnesses as the man who fled the accident scene. We held this evidence to be sufficient.

*Tefke v. State*, 6 Md. App. 139, 250 A. 2d 299 (1969).

There was evidence of excessive speed, which we said was corroborated by the location of the vehicles after the accident; the damage to the vehicles, and the fatal injuries. In addition to the corroborated evidence of speed, it was shown that the defendant failed to stop at a red automatic signal, did not reduce speed as he entered the intersection, and had been drinking immediately prior to the accident.

In two cases the Court of Appeals has reversed convictions of manslaughter by automobile, holding in each case that as a matter of law, the evidence was insufficient to support the conviction. They are:

*Thomas v. State*, 206 Md. 49, 109 A. 2d 909 (1954).

Defendant, driving a beer distribution truck for Montgomery County, went out of control at the top of a hill, careened down the hill going off the pavement first on one side, then the other, and struck and killed two children on a bridge at the bottom of the hill. Defendant, a 19 year old employee of the County, had drunk six bottles of beer during the five and one half hours before the accident, two of the bottles just a few minutes before the accident, which occurred at 3:30 P.M. The truck appeared, to a following witness, to be operated normally until it reached the curve at the top of the hill. The brakes on the truck had been recently repaired, but defendant had complained later to his superior that the brakes were still not functioning properly — sometimes they would take hold properly and sometimes they would grab. He had been told to take the truck in again when it could be spared. Defendant stated that he did not apply the brakes after the truck went out of control, as he

was afraid it would upset the truck. An investigating officer noticed alcohol on defendant's breath and asked him about it, but did not charge him with operating under the influence of alcohol.

The Court said there were three factors from which gross negligence might be deduced: excessive speed, defective brakes, and intoxication. The trial judge, without a jury, had based his finding of guilt on intoxication.

The Court of Appeals held that with respect to each of the three factors, the evidence was not sufficient to warrant a finding of gross negligence.

*Johnson v. State*, 213 Md. 527, 132 A. 2d 853 (1957).

The accident in this case occurred on William Street, a one way four lane highway in Baltimore City, at about 1:50 A.M. Where the street turns sharply to the left, defendant's car failed to make the turn, and hit the far curb, then sideswiped a utility pole, and stopped some 600 feet from the pole. A passenger, who was thrown from the car and found 66 feet from the pole, died of his injuries. Another motorist approaching the turn heard wheels squealing, saw the defendant's car pass her, and estimated its speed at 60 miles an hour, although as to miles an hour that estimate was considerably weakened by the witness's ambivalence.

An investigating officer said the defendant had the odor of alcohol on his breath, but he appeared normal except for the usual nervousness.

The trial judge found the defendant guilty because his excessive speed rendered him unable to control the car. The Court of Appeals, in reversing the conviction, reviewed what it had said in other cases about speed. It said, at 532-33:

> "In the *Lilly* case this Court quoted from the *Duren* case at page 443 of 212 Md.: 'It is plain that the environment in which speed is indulged must determine whether it does or does not show gross negligence at a given time. Speed in the open country on a four lane highway may be very high and not constitute negligence. A much lower rate of speed in a city street may constitute gross

negligence. This, too, was the law long before automobiles existed. * * * Obviously, what must be looked for in each case is whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another. Cf. *Darienzo Trucking Corp. v. Sullivan*, 202 Md. 32, 39-40, 95 A. 2d 293, 296. If there is found such lack of control, whether by reason of speed or otherwise, in a place and at a time when there is constant potentiality of injury as a result, there can be found a wanton and reckless disregard of the rights and lives of others and so, criminal indifference to consequences.' To this we added that 'Judge Henderson in the dissenting opinion in that [the *Duren*] case agreed that speed must be weighed in the light of the surrounding circumstances.' "

In the case now before us, the review of the facts by the trial court, summarized by Judge Moore in his opinion for the majority of this Court, builds a house of cards upon one, and *only one*, relevant basic fact — the opinion of a witness that appellant's speed was 60 miles an hour.[1]

The review says that the appellant was guilty of erratic driving. I find no valid support for this statement. The witness said that at one point, when appellant's car was well ahead of the witness, appellant changed from the left to the right lane of a two lane, one way roadway. In the course of such a change, he obviously had to straddle the lanes. The change of lanes in no way interfered with any other traffic. It was a perfectly lawful maneuver, and gives rise to no in-

---

1. I have said that the witness's opinion was admissible and its credibility was for the trial judge. I would have difficulty in crediting it. The witness said that the two cars were side by side at a red light; defendant took off pretty fast, and got about a half a block ahead; and remained a half a block ahead for the next 2¹/₂ blocks while the defendant was going 60 and the witness was going 40. The two cars were still so close together when the witness saw the pedestrians step from the median strip into his lane, the left, he started applying his brakes. It is very difficult for two moving objects to maintain a constant interval between them while traveling the same direction at different speeds.

ference of erratic driving. The witness said that while he and appellant were stopped side by side at a traffic light some two or more blocks back, the appellant was "gunning his motor". Although both seem to attach significance to that evidence, neither the trial judge nor the majority of this Court explains how gunning a motor indicates a wanton or reckless disregard for human life. If it has any significance at all, it might indicate an impatience from which one might infer a desire or tendency to speed, but inferring such a tendency can add nothing to the fact of speed, already shown.

The review says that the appellant failed to keep a proper lookout. There is no evidence to support this conclusion. It could be reached only by reasoning backward from the fact of the accident itself, and from the fact that the witness, who was some distance behind the appellant, said he saw the two young people step off the median strip and walk across the Parkway. What that means is that the witness saw the pedestrians enter and cross the left lane, 10 feet wide, before they entered the right lane, where appellant first saw them. It seems entirely reasonable to me that objects to one side of the path of an automobile will not show up in its headlight beams when the source of light is close to the objects, but will show up in the beams of headlights when the source is farther away.

Since the only relevant inquiry is the manner of operation of the automobile leading up to and at the time of the impact, such factors as the nature and force of the impact, the distance the victims were carried or thrown, marks of skidding, if any, and the distance the automobile traveled after the impact, would be significant only as indicators of speed if speed were an issue. In our consideration of sufficiency, we do not resolve issues of fact. The direct evidence estimating the speed at 60 miles an hour does away with any need for *indicators* to permit us to say that the trier of the facts could find from the evidence that the speed was 60 miles an hour.

Nor do I see any significance in what the appellant did after the accident. The trial judge said "his reflex was to

take off". I can only descend to the vernacular, and ask, "So what?". I am deeply concerned with his pre-accident conduct, but I have no judicial interest in his post-accident reflexes. Some of the cases have mentioned that flight from the scene is a factor which may be considered. So it is, when identity of the driver is an issue, or the *corpus delicti* of the crime is questioned, because under some circumstances flight may indicate a consciousness of guilt.

What do we have here? The driver, in panic, drove to his nearby home and went in, stayed a few minutes, then returned to the scene and reported to the police officer that he was the driver. Of course, even that brief flight is reprehensible, if understandable. But if its legal significance is that it shows a consciousness of guilt, is the majority prepared to say that this young man, in those few seconds after the accident, indulged in a process of sophisticated legal reasoning and concluded that he was guilty, not merely of simple negligence, but of gross negligence as defined in the judicial opinions construing Article 27, § 388 of the Maryland Code, and, by his flight, demonstrated his consciousness of that higher degree of guilt? I am not.

The cases reviewed have, for the most part, included factors of drinking, running through a stop sign or a red light, or driving on the wrong side of the road. Only in *Duren v. State, supra,* was "speed in the environment" held sufficient. The Court, in *Duren,* said, at 592:

> "Obviously, what must be looked for in each case is whether, by reason of *the speed in the environ-ment,* there was a lessening of the control of the vehicle to the point where such lack of effective control is likely at any moment to bring harm to another."

The "lack of control" it discussed is that which exists "in a place and at a time when there is constant potentiality of injury as a result".

It is elementary that the effect of speed on the degree of control of a motor vehicle is relative, and no doubt begins when the vehicle is moved from a standing position. So the

important considerations are whether the speed, under the circumstances, is "likely at any moment to bring harm to another", or creates a "constant potentiality of injury". The evidence in this case simply does not stand up under that test. It is true that contributory negligence of a victim does not excuse gross negligence of a defendant, but certainly the law does not impose upon a motorist the duty to expect the kind of negligence of the pedestrians in this case as a "constant potentiality".

If I were writing the majority opinion for the Court in this case, I would adopt the concluding paragraph in *Johnson v. State, supra,* which said:

> "The speed that was indulged in, at the time and in the place, in the case at bar is not such that amounts to criminal indifference to consequences. In the environment of the instant case, the evidence is not, in our estimation, sufficient to warrant a finding of guilt, beyond a reasonable doubt, of conduct on the part of the defendant amounting to a wanton or reckless disregard of the rights and lives of others. We are accordingly of the view that the conviction must be reversed."