702 A.2d 453

McCarthy PLUMMER

v.

STATE of Maryland.

No. 322, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Nov. 6, 1997.

Anne Miller, Student Atty. (Rule 16) (Stephen E. Harris, Public Defender and Martha Weisheit, Asst. Public Defender, on the brief), Baltimore, for Appellant.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Robert Dean, State's Atty. for Montgomery County, Rockville, on the brief), for Appellee.

Argued before DAVIS, THIEME and KENNEY, JJ.

THIEME, Judge.

McCarthy Plummer, the appellant, was convicted by a jury in the Circuit Court for Montgomery County of automobile manslaughter and related offenses. On appeal, he raises the following issues, which we shall slightly rephrase:

1. Was the evidence sufficient to sustain the appellant's convictions for automobile manslaughter and reckless driving?
2. Did the trial court err in instructing the jury that flight from the scene could show consciousness of guilt?
3. Did the trial court err in refusing the appellant's request for a Bill of Particulars?

Because we agree that the evidence was insufficient to sustain the appellant's convictions for automobile manslaughter and

reckless driving, we reverse the judgment of the lower court. Accordingly, we need not reach the merits of the other issues raised on appeal.

# I.

# BACKGROUND

We shall save for that portion of our opinion dealing with the sufficiency of the evidence a detailed recounting of the facts in the instant case. For present purposes, suffice it to say that the appellant was charged by indictment with manslaughter by vehicle, failure to remain at the scene of an accident, failure to give information and render aid, and failure to control speed to avoid a collision. In July of 1996 the appellant was tried before a jury for the foregoing offenses, but a hung jury resulted. Thereafter, the appellant was retried for all offenses except failure to control speed to avoid a collision.[1] The second trial took place from 13 January through 15 January 1997. At the conclusion of the retrial, the appellant was found guilty on all counts, as well as reckless driving and negligent driving. Subsequently, the appellant was sentenced to six years incarceration with four years suspended for the automobile manslaughter conviction, one year consecutive for failure to remain at the scene of an accident, and was placed on unsupervised probation for five years. The remaining conviction was merged.

This timely appeal followed.

# II.

# SUFFICIENCY OF THE EVIDENCE

# A.

# The Facts

■ The appellant first complains that the evidence was insufficient to sustain his convictions of automobile manslaugh-

---

1. The appellant had been granted a Motion for Judgment of Acquittal as to that offense during the July 1996 trial.

ter and reckless driving. Because automobile manslaughter necessarily incorporates the lesser included offense of reckless driving, *see Pineta v. State,* 98 Md.App. 614, 622, 634 A.2d 982 (1993), we shall first discuss whether the evidence was, in fact, legally sufficient to support his conviction of automobile manslaughter.

The evidence at trial established the following facts. On 22 December 1995 at approximately 2:30 p.m., twelve-year-old Brooke Williams ("the victim") was proceeding home from school on a sidewalk parallel to Piney Branch Road in Takoma Park. The configuration of the area was described at trial as a highway running north and south, with one lane in each direction and a common median lane marked by yellow lines. On the right side of the roadway is a white shoulder line; approximately eight feet separated the shoulder line from the beginning of the curb. The curb, referred to as a "quarter rim," was, instead of a concrete curb perpendicular to the roadway, more of a gradual slope made of asphalt approximately three inches in height.

While walking with several of her friends, the victim was struck from behind by the appellant's vehicle. From the force of the collision the victim was propelled backward, struck the hood of the appellant's vehicle, and was thrown to the street where she lay unconscious and dying. The victim's friends immediately began calling for help, and moments later various adults arrived to administer aid.

Charles Hawkins, the only eyewitness to the events immediately prior to and following the accident, was the driver of the vehicle directly behind the appellant's vehicle at the time of the accident. Mr. Hawkins estimated the speed of his vehicle, as well as the appellant's, as "[b]etween 25 and 35 miles per hour" in a 30–mile–per–hour zone. When questioned on direct examination, Mr. Hawkins further illuminated the events of that afternoon:

> **Q:** Now did there come a time when you noticed something specifically about this vehicle that alarmed you?

**A:** I notice[d] the vehicle starting to drift to the right side of the road.

  \*   \* ·   \*   \*   \*   \*

**Q:** Now when you saw the vehicle start to drift to the right, did you do anything?

**A:** I started blowing my horn and I figured—it was kind of cold during this time of year so I figured his windows were up and my windows were up. I kept blowing the horn and didn't get a response or anything so I started flashing my high beams to try to get his attention.

**Q:** And did the driver of the vehicle have any reaction to what you did?

**A:** No. There was none until after the accident.

**Q:** Now did you see anyone on the sidewalk as you were flashing your beams and blowing your horn?

**A:** Yes.... School must have just let out because there were kids walking up and down Piney Branch and probably about 20 to 25 feet in front of us there was a group of kids there, about three or four, off to the right, in the direction that the car was headed.

  \*   \*   \*   \*   \*   \*

**Q:** And what did you see after—after you blew your horn, what happened after that?

**A:** I blew my horn and flashed my lights and in a matter of seconds the burgundy car struck one of the little girls that were there and also you could see—it was almost as if the girls were holding hands because you could see one girl's hand go up in the air as the other one went up and over the top of the car.

Mr. Hawkins further confirmed that all of the children, including the victim, were on the sidewalk at the time of the accident, and that, accordingly, the appellant's vehicle was on the sidewalk when it struck the victim.

When asked if he noticed anything unusual about the appellant's car just before it struck the victim, Mr. Hawkins replied,

"Not other than the car just drifting. That was it." Mr. Hawkins also observed that the appellant's vehicle had actually decreased in speed when it began to approach the school area.

Immediately after the accident, the appellant made a U-turn on Piney Branch Road so that the appellant's car and Mr. Hawkins's car were alongside one another. At that point, Mr. Hawkins testified:

> I put my window down and told him—I said ["]you just hit the little girl back there["]. . . . He said ["]I'm going back["] and pointed in the direction back towards [where] the accident had happened.

Despite the appellant's assertions that he was going to return to the scene, Mr. Hawkins observed that the appellant "[j]ust sped up and kept going." Mr. Hawkins had in the meantime called 911, and because he had followed the appellant for a short distance he was able to provide police with the appellant's license plate number before stopping alongside the road and waiting for the police to arrive.

On cross-examination, Mr. Hawkins confirmed the previous facts. He further noted that by the time his and the appellant's vehicles had made the U–Turns and passed the accident scene several cars had stopped to render assistance and various adults had arrived at the scene:

**Q:** So it wasn't a situation where the child was simply left out on the roadway. There were actually people there to start to do whatever could be done under the circumstances.

**A:** Yes.

      \*     \*     \*     \*     \*     \*

**Q:** And you have already indicated that the whole process of the vehicle starting to drift, from the time that it started to drift until it struck the child was just a matter of seconds?

**A:** Yes.

**Q:** A very quick thing?

A: Yes.

Also called as witnesses for the State were various students who were walking home along the same sidewalk that the victim had been using. The students gave their accounts of the impact. They were unable to observe the appellant's vehicle prior to the accident, however, because they were walking away from the vehicle, and hence, their backs were turned toward the vehicle. The student witnesses confirmed, however, that at no time did the vehicle that struck the victim stop or render any assistance.

Officer Brian Rich of the Prince George's County Police Department arrived at the scene approximately two hours after the accident. On investigating the license plate number provided by Mr. Hawkins, Officer Rich was able to locate the appellant's vehicle that same evening in a residential area of the District of Columbia. The vehicle had damage to the hood and the front end, and arrangements were made for it to be impounded for further investigation.

Three days later, at 3:30 a.m. on Christmas morning, the appellant turned himself in at the Oxon Hill Police Department. On arrival at the station the appellant informed the police, "I think I am involved in an accident where a 12-year-old girl was killed on Piney Branch Road." During the booking process, the appellant commented at least two times that he wished he were dead, said that he felt like dying, and made other remarks of the same nature.

Various other police officers, who were assigned the task of reconstructing the accident at trial, also testified. From their testimony it was established that at the time of the collision the appellant's vehicle was traveling at between 33 to 37 miles per hour. Accounting for a margin of error, one officer admitted that the appellant's speed could have been as low as 31 miles per hour at the time of the accident. In fact, the State conceded to the jury in its opening argument that "this case . . . is not about high speed."

At the close of the State's case-in-chief, the appellant made a Motion for Judgment of Acquittal, arguing insufficiency of the evidence. Specifically, defense counsel commented:

[W]ith the evidence at this juncture we have a case I think that is unlike any case in which vehicular homicide has ever been sustained on appeal in Maryland.

\* \* \* \* \* \*

This is a civil negligence case. This is perhaps a negligence case for negligent driving, failure to exercise care and prudence in the operation of a motor vehicle. However, how could it possibly be evidence of gross negligence?

Although noting the difficulty presented by the facts in the instant case, the trial court ultimately denied the appellant's motion. After electing to call no witnesses on its behalf, the defense rested and the case was submitted to the jury.

## B.

### Standard of Review

When presented with a claim of insufficiency of the evidence on appeal,

the reviewing court is not to "ask itself whether *it* believes the evidence at the trial established guilt beyond a reasonable doubt"; rather, the duty of an appellate court is only to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336 (1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original); *Oken v. State*, 327 Md. 628, 661, 612 A.2d 258 (1992); *Goldring v. State*, 103 Md.App. 728, 732, 654 A.2d 939 (1995). The evidence must be viewed in a light most favorable to the State, "giving due regard to the trial court's finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses."

*Albrecht, supra,* at 478, 649 A.2d 336; *State v. Raines,* 326 Md. 582, 589, 606 A.2d 265, *cert. denied,* 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992).

With regard to the specific offense at hand, manslaughter by automobile is set forth in section 388 of article 27. It provides, in pertinent part:

> Every person causing the death of another as the result of the driving, operation or control of an automobile . . . in a grossly negligent manner, shall be guilty of a misdemeanor to be known as "manslaughter by automobile . . .," and the person so convicted shall be sentenced to jail for not more than 10 years, or be fined not more than $5,000 or be both fined and imprisoned.

Md.Ann.Code, art. 27 § 388 (1996 Repl. Vol).[2] The common law standard of "gross negligence" has been adopted in cases of automobile manslaughter as the minimum requirement for a conviction. *Faulcon v. State,* 211 Md. 249, 257, 126 A.2d 858 (1956); *State v. Gibson,* 4 Md.App. 236, 242–43, 242 A.2d 575 (1968), *aff'd,* 254 Md. 399, 254 A.2d 691 (1969). Gross negligence in this context has been defined as "a wanton or reckless disregard for human life." *Kramer, supra,* at 580, 569 A.2d 674; *Pineta v. State,* 98 Md.App. at 622, 634 A.2d 982. In *Kramer,* the Court of Appeals quoted with approval the language in its earlier opinion of *Duren v. State,* 203 Md. 584, 102 A.2d 277 (1954), in which Judge Hammond further explained the concept of gross negligence:

> Obviously, what must be looked for in each case is whether, by reason of the speed in the environment, there was a lessening of control of the vehicle to the point where such a

---

**2.** Effective 1 October 1997, sections 388 and 388A (Homicide by motor vehicle or vessel while intoxicated) were repealed and replaced by a new consolidated statute, entitled "Manslaughter by Vehicle and Homicide by Motor Vehicle or Vessel While Intoxicated, Intoxicated Per Se, or Under the Influence—Penalties." The substance of section 388 was enacted without change, with the one exception being that the offense was made a felony. *See* 1997 Md. Laws 372. As the offense in the instant case occurred in 1995, we shall, in our discussion, refer only to section 388.

lack of effective control is likely at any moment to bring harm to another. If there is found such lack of control, whether by reason of speed or otherwise, in a place and at a time when there is constant potentiality of injury as a result, there can be found a wanton and reckless disregard of the rights and lives of others and so, criminal indifference to consequences.

*Id.* at 592, 102 A.2d 277 (internal citation omitted).

In sum, Judge Orth, writing for the Court of Appeals in *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990), explained the modicum of proof necessary to sustain a conviction for manslaughter by motor vehicle:

In each case, as a matter of law, the evidence must be sufficient beyond a reasonable doubt to establish that the defendant was grossly negligent, that is, he had a wanton or reckless disregard for human life in the operation of an automobile. It deals with the state of mind of the defendant driver. Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind. Simple negligence will not be sufficient—even reckless driving may not be enough. Reckless driving may be a strong indication, but unless it is of extraordinary or outrageous character, it will ordinarily not be sufficient.

*See also Nast v. Lockett,* 312 Md. 343, 351, 539 A.2d 1113 (1988).

█ The reversal of any conviction due to an insufficiency of the evidence carries with it a heavy burden. Indeed, it was not until fairly recently in Maryland's jurisprudence that an appellate court of this State even had the power to review a conviction for sufficiency of the evidence. *See Gray v. State,* 254 Md. 385, 387, 255 A.2d 5 (1969), *cert. denied,* 397 U.S. 944, 90 S.Ct. 961, 25 L.Ed.2d 126 (1970) (In 1950, section 5 of Article XV of the Maryland Constitution was amended so that, "although the jury remained the judge of the law as well as the fact, 'the Court may pass upon the sufficiency of the evidence to sustain a conviction.' "). The only remedy on appeal is a reversal; no retrial may be had, regardless of how

egregious the offense alleged or how harsh the consequence of literally allowing the accused to go free. *In re Petition for Writ of Prohibition,* 312 Md. 280, 313, 539 A.2d 664 (1988) ("[I]nsufficiency of the evidence is today a singularly inappropriate basis for ordering a new trial, because if the evidence was insufficient to go to the jury in the first place, double jeopardy principles preclude a new trial.").[3]

Nevertheless, both this Court and the Court of Appeals have on more than one occasion found such a reversal necessary when, even by viewing all evidence in the light most favorable to the State, no rational trier of fact could have found guilt beyond a reasonable doubt. Regrettably, we are presented with such a situation here. There is little doubt in our minds that the actions of the appellant on 22 December 1995 were reprehensible, immoral, and callous. We can think of many other terms to describe the appellant for being directly responsible for the death of a twelve-year-old girl as she strolled home from school to enjoy the beginning of her Christmas vacation, a Christmas that she would never celebrate. "Murderer," however, is not one of those terms.[4] We explain why.

---

**3.** With the decision in *Gray, supra,* the Court of Appeals originally declared that, in limited circumstances, a retrial could be ordered even when an appellate court reversed a conviction due to insufficiency of the evidence. *Gray* specifically held:

> We conclude that if the record before the Court of Special Appeals indicates that additional probative evidence of guilt can be adduced by the State at another trial necessitated by the insufficiency of the evidence, a new trial should be awarded after a reversal if the interests of justice appeal to require it.

*Ensor v. Lewis,* 54 Md. 391, 397 (1880).

Nine years later, however, the Court of Appeals held that, once a reversal is obtained due to legally insufficient evidence to sustain the conviction, a retrial is not permissible. *Mackall v. State,* 283 Md. 100, 114, 387 A.2d 762 (1978). Accordingly, the Court in *Mackall* specifically held that the foregoing principle set forth in *Gray* "is no longer the law of this State." *Id.*

**4.** So that our use of the term "murderer" is not misconstrued, we use that term in its broad sense, synonymous with the homicidal act of the death of one human being caused by another human being.

## C.

### The Law in Maryland

Before returning to the facts in the instant case, it first behooves us to take a closer look at those cases in which automobile manslaughter convictions were challenged based on an insufficiency of the evidence. After examining those cases, we will be better able to determine what exactly constitutes the requisite mental state of gross negligence to support a conviction. It is only after carefully studying the foundation that has been laid before us that the rationale underlying our inevitable holding will become clear.

### 1.

### Conviction for Automobile Manslaughter Affirmed

We begin our case analysis in Maryland with our decision in *Boyd v. State*, 22 Md.App. 539, 323 A.2d 684 (1974). We choose to use *Boyd* as our starting point because of Judge Moore's succinct and thorough evaluation of what factors are properly considered when determining the sufficiency of the evidence for a charge of automobile manslaughter.

In that case, Boyd struck and killed two teenage pedestrians who were crossing a street and who were, at the time of the collision, in the curb lane of the road. The accident occurred at 3:10 a.m. in a residential area of Baltimore City. At the time of the collision, Boyd was heading home after having been bowling with his brother, the passenger in his vehicle. Witnesses estimated Boyd's vehicle to be traveling at a high rate of speed in a zone posted 30 miles per hour. Various witnesses testified that immediately prior to the collision Boyd's vehicle had been observed swerving between lanes. From the force of the collision, the victims' bodies were propelled some 56 feet and 126 feet, respectively, from the point of impact. After striking the teenagers, Boyd continued on in his vehicle without stopping to render any assistance. He returned to the scene approximately thirty minutes later and informed the police that he was the driver who hit the teenagers. 22 Md.App. at 540–44, 323 A.2d 684.

In addressing Boyd's claim of insufficiency of the evidence, we explained:

The factors properly discerned by the trial judge from the decided cases as directly relevant to the issue of guilt or innocence in a manslaughter by automobile case included: (a) drinking ...; (b) failure to keep a proper lookout and to maintain proper control of the vehicle; (c) excessive speed *"under the circumstances;"* (d) flight from the scene without any effort to ascertain the extent of the injuries; (e) the nature and force of impact; (f) unusual or erratic driving prior to impact; (g) the presence or absence of skid marks or brush marks; (h) the nature of the injuries and the damage involved to the vehicle or vehicles; (i) the nature of the neighborhood, the environment where the accident took place.

22 Md.App. at 550–51, 323 A.2d 684 (emphasis by trial judge). Based on those factors, we held in that case that Boyd's excessive speed, erratic driving, failure to keep a proper lookout, and flight, as well as the nature and force of impact and the area where the accident occurred, all provided the trier of fact with more than sufficient evidence to convict Boyd of manslaughter by automobile. *Id.* at 551–53, 323 A.2d 684. Accordingly, our decision in *Boyd* and the nine factors enunciated in subsequent cases have served as guidance for future cases in determining what is properly taken into consideration when determining if, in fact, an automobile manslaughter conviction can stand.

Recently, this Court has been faced with convictions for automobile manslaughter based on situations in which drivers elected to engage in the all-too-dangerous drag race. In fact, the most recent reported case in which a conviction for automobile manslaughter was affirmed based on sufficiency grounds deals with such a situation. *Goldring v. State, supra.* In that case, Goldring had spent the earlier part of the day of the fatal collision drag racing at the Maryland International Raceway in St. Mary's County. The race track closed before Goldring and another friend, Hall, had an opportunity to race each other. The two decided, therefore, that they would race

on a public road that had two lanes. Accordingly, a portion of the road was marked off, a flagman was appointed, and some 50 to 75 bystanders gathered to watch. The race began, and at some point prior to its completion Hall's vehicle struck Goldring's vehicle and spun out of control. Both vehicles were traveling at speeds of over 100 miles per hour on a road with a posted speed of 45 miles per hour. Hall's vehicle spun airborne out of control, struck two parked vehicles, and killed two bystanders. Hall himself was also killed in the collision. 103 Md.App. at 730–31, 654 A.2d 939.

On appeal, Goldring argued the evidence was insufficient to sustain his conviction for automobile manslaughter because (1) both vehicles had previously undergone safety checks at the racetrack, (2) the race had occurred on a pre-measured and marked off stretch of a county road, and (3) the bystanders, because of their willing participation in watching the race, "like the racers, did not think that their participation demonstrated a wanton and reckless disregard of their own lives." 103 Md.App. at 732, 654 A.2d 939. This Court, however, had little difficulty finding ample evidence to sustain Goldring's conviction. Judge Salmon, writing for this Court, pointed out that the speed of the vehicles, the configuration of the road,[5] the lack of proper registration of either vehicle,[6] as well as the drag race itself, constituted more than enough evidence for a fact-finder to have convicted the appellant.

As in *Goldring*, this Court was once again presented with a case of drag racing gone deadly in *Pineta v. State, supra.*

---

**5.** The road had no shoulder, was bordered by ditches on both sides, and there was a curve a few hundred feet from the starting point of the race. 103 Md.App. at 733, 654 A.2d 939.

**6.** Apparently, an officer testified that the vehicles were not properly registered because they had been stripped of many usual features on vehicles so as to lighten the weight of the vehicles and obtain the maximum speed possible. For example, an examination of Goldring's vehicle revealed that it had no passenger's seat, no rear seat, the speedometer was inoperative, the lighting equipment was inoperative, and the floor boards were rusted with holes through the boards. 103 Md.App. at 733, 654 A.2d 939.

And, as previously, the evidence was held sufficient to sustain Pineta's conviction for automobile manslaughter. Pineta and another individual decided to race one night. Beginning at an intersection of a road that was three lanes wide in each direction, the two drivers "revved" their engines and began to race one another, reaching speeds of between at least 60 to 70 miles per hour in an area with a posted speed limit of between 35 and 45 miles per hour. The other vehicle involved in the race, however, lost control while attempting to negotiate a left turn and struck an oncoming vehicle. Both occupants of the oncoming vehicle were killed. 98 Md.App. at 618–19, 634 A.2d 982. This Court pointed to the excessive speed of the vehicles, as well as the initiative to drag race, as evidence that "the victims' deaths were the direct consequence of gross negligence on the part of both [drivers]." 98 Md.App. at 626, 634 A.2d 982.[7]

Other instances of erratic driving or failure to obey simple traffic laws enacted for the safety of all on public roads have sustained convictions for automobile manslaughter. One such instance occurs when a vehicle fails to stop for a red light or stop sign. In *Taylor v. State*, 83 Md.App. 399, 574 A.2d 928 (1990), for example, Taylor's conviction was affirmed where the evidence showed that he was driving on a highway at a high rate of speed, he was weaving to pass other vehicles, and he failed either to slow down or to stop for a red light at an intersection, thus colliding with another vehicle and killing the driver of that vehicle. 83 Md.App. at 400, 404, 574 A.2d 928.

Similarly, this Court in *Tefke v. State*, 6 Md.App. 139, 250 A.2d 299 (1969), was presented with a situation in which Tefke was driving his vehicle in Baltimore City at speeds of between 50 and 55 miles per hour in a 30 mile per hour zone when he, without slowing down, proceeded through a red light at an intersection and struck a vehicle crossing the intersection. 6

---

7. We note parenthetically that in *Pineta* this Court was primarily concerned with the issue of whether any driver participating in an illegal drag race could be convicted of manslaughter when a third person has been killed as a direct consequence of that race. This Court held such a conviction proper.

Md.App. at 142–44, 250 A.2d 299. This Court noted that the excessive speed, the failure to stop for a red light, the absence of skid marks, and Tefke's own admission that he had been drinking prior to the collision served as sufficient evidence of guilt. *Id.* at 147–48, 250 A.2d 299.

*Pierce v. State*, 227 Md. 221, 175 A.2d 743 (1961), also involved a situation in which Pierce failed to stop at a stop sign at a "T" intersection before attempting to make a right angle turn. Because Pierce's vehicle was proceeding at a speed of between 90 and 100 miles per hour, he lost complete control, and the vehicle proceeded through the intersection, through a steel guard rail, and down a ravine until his vehicle was stopped only by a tree some 80 feet from the roadway. The passenger in Pierce's vehicle was killed as a result of the collision. 227 Md. at 224, 175 A.2d 743. Pierce also admitted to having consumed six to eight bottles of beer during the three hours prior to the accident, and an officer found a half pint of gin in the vehicle. Although Pierce subsequently denied that he was the operator of the vehicle and instead maintained that the deceased had been the operator, the court found sufficient circumstantial evidence that Pierce was, in fact, behind the wheel and accordingly affirmed the lower court's conviction. *Id.* at 226–27, 175 A.2d 743.

The Court of Appeals was again confronted with such a "failure to stop" case in *Lilly v. State*, 212 Md. 436, 129 A.2d 839 (1957). In that case, Lilly's car collided with a bus at an intersection in Baltimore City at 3:30 a.m. Lilly was proceeding southbound in his vehicle at approximately 50 to 60 miles per hour when, without slowing or stopping at a stop sign, he collided with the eastbound bus. The passenger in Lilly's vehicle was killed. The marked speed limit in that area was 25 miles per hour, and when questioned by officers about an odor of alcohol, Lilly admitted that he had been drinking. 212 Md. at 438–441, 129 A.2d 839. Given the previous facts, the Court concluded, "[t]here was ample evidence from which the trial judge could find that the defendant, who had been drinking, drove his automobile in the City through a stop sign

at excessive speed and crashed into the bus which was on the through street, resulting in the death of his passenger, and that these actions amounted to a wanton and reckless disregard for human life, and constituted manslaughter by automobile." 212 Md. at 444–45, 129 A.2d 839.

Another example of failure to obey common sense safety rules includes crossing the center line of a two-lane highway. In *State v. Kramer, supra*, Kramer was operating his vehicle southbound on a rural road, one lane in each direction, shortly before midnight. There was a vehicle traveling directly in front of Kramer, and Kramer attempted to pass that vehicle and he crossed the center line in a no passing zone in order to do so. Unfortunately, a vehicle traveling in the northbound lane was unable to get out of the way in time. Although that vehicle did proceed to the shoulder in order to give Kramer more room to pass, Kramer sideswiped the oncoming vehicle, killing one of the passengers. An officer on the scene after the accident noted that the first sign of brake application of Kramer's vehicle was on the northbound shoulder. 318 Md. at 586–89, 569 A.2d 674. Furthermore, the testimony indicated that Kramer was going at an excessive rate of speed, and he admitted that he was probably traveling at about 75 miles per hour (the posted speed limit was 55 miles per hour). The Court of Appeals found that, based on the excessive speed, Kramer lost control of his vehicle and failed to keep a proper lookout for oncoming vehicles so that there was the "constant potentiality of injury as a result." 318 Md. at 592, 569 A.2d 674 (internal quotations omitted).

*Cummings v. State*, 27 Md.App. 361, 341 A.2d 294 (1975), is also instructive. In that case, Cummings had been drinking with several friends prior to the accident. The group had been drinking for some time when Cummings and his friends entered a trailer truck with Cummings as the driver and proceeded northbound on Annapolis Road. Cummings failed to negotiate properly a curve in the road, and his vehicle crossed the center line, striking an oncoming vehicle and

killing a four-year-old passenger of that vehicle.[8] It was estimated that Cummings was traveling at 40 to 45 miles per hour in a 30 mile per hour zone. 27 Md.App. at 369, 341 A.2d 294. Judge Moylan, writing for this Court, initially noted that "[a] speed of 40–45 miles per hour in a thirty mile per hour zone is evidence of some negligence, but hardly, standing alone, evidence of the gross criminal negligence required to prove manslaughter." *Id.* at 388, 341 A.2d 294. Nevertheless, when considering the fact that Cummings was operating his vehicle at an excessive rate of speed along with the fact that he was under the influence of alcohol, this Court held that sufficient evidence existed to support his conviction for automobile manslaughter. *Id.* at 389, 341 A.2d 294. *See also Abe v. State*, 230 Md. 439, 187 A.2d 467 (1963) (conviction for automobile manslaughter affirmed when vehicle was traveling at an excessive speed and appellant "had been drinking to an extent likely to affect his driving judgment[.]").

This Court also affirmed a conviction for automobile manslaughter in a case in which a vehicle was traveling at a fast rate of speed, swerving from one side of the road to the other, and it veered across the center lane and struck an oncoming vehicle head on. *Montague v. State*, 3 Md.App. 66, 237 A.2d 816 (1968). Following the collision, Montague as well as his passenger fled the scene, despite being called by various witnesses to return. Furthermore, it was brought out at trial that less than an hour before the accident, Montague had been stopped by an officer for a traffic violation. At that time, the officer noticed alcohol on Montague's breath,[9] and because Montague did not have a valid driver's license, the officer ordered Montague not to drive his vehicle. Montague, however, disobeyed the officer's order. 3 Md.App. at 68–69, 237 A.2d 816. Based on all of the evidence presented, including

---

**8.** The driver of the oncoming vehicle testified that, although she pulled her vehicle over to the side of the road and came to a complete stop after noticing Cummings's oncoming vehicle, she was unable to avoid being hit. 27 Md.App. at 388, 341 A.2d 294.

**9.** Montague was not, however, charged with drunken driving.

"the appellant's flagrant disregard of the elementary princi-
ples of the Maryland traffic laws," *id.* at 72, 237 A.2d 816, this
Court found ample evidence to sustain his conviction.

*Wasileski v. State,* 241 Md. 323, 216 A.2d 551 (1966), also
dealt with a situation in which the driver was traveling with
more than half of his vehicle crossed over the center line of a
two-way road. The passenger in his vehicle testified that
Wasileski had been drinking and that she warned him to stop
speeding and told him that he was driving on the wrong side
of the road. The passenger's admonitions, however, came too
late, and Wasileski side-swiped a vehicle traveling in the
opposite direction. 241 Md. at 324–25, 216 A.2d 551. The
Court of Appeals found that "[t]he evidence of the effect of his
consumption of alcohol" along with testimony "that he was
flagrantly violating the Maryland traffic laws by driving on the
wrong side of the road, during daylight hours, without any
good reason for doing so," *id.* at 328, 216 A.2d 551, was
sufficient to support his conviction.

Instances in which a pedestrian has been struck while
crossing a street have also supported convictions for automo-
bile manslaughter. *Clay v. State,* 211 Md. 577, 128 A.2d 634
(1957), is instructive on that point. There, Clay was driving
on a city street in Baltimore at approximately 1:30 a.m. when
his vehicle struck a pedestrian that was crossing the street at
a cross walk. Immediately after the collision Clay fled the
scene. He later admitted: "I looked out at the man, got
scared, got back in my auto and drove my girl . . . to her
home." 211 Md. at 583, 128 A.2d 634. Clay further admitted
to having consumed alcohol previously that evening. After an
examination of the evidence, the Court of Appeals held:

> [W]e see there is evidence from which the court below may
> have deduced any one or more of the following factors in
> finding guilt: failure to keep a proper lookout; passing
> recklessly at an intersection; striking a pedestrian in a
> cross-walk; excessive speed under the circumstances; driv-
> ing while drinking to the extent of probably affecting one's
> judgment and discretion or probably affecting one's nervous
> system to the extent that there is a failure of normal

coordination, although not amounting to intoxication; and flight.

*Id.* at 584, 128 A.2d 634. The Court continued, "it has long been held that defendant's flight is relevant to be considered by the tribunal trying the facts as bearing upon guilt," *id.* at 584–85, 128 A.2d 634, although it appeared to place less emphasis on that factor and the alcohol consumption than the other evidence of gross negligence.[10] Therefore, Clay's conviction was affirmed.

Also, in *Duren v. State, supra,* a pedestrian was struck and killed when Duren, who was operating a vehicle in a heavily populated area of Baltimore City at 7:00 p.m., traveling at 60 miles per hour or more, failed to stop for the pedestrian. 203 Md. at 588–89, 102 A.2d 277. The Court of Appeals held that Duren's speed, so grossly excessive under the circumstances, *i.e.,* in a highly populated area on a Sunday evening, amounted to a wanton and reckless disregard for human life. *Id.* at 590–91, 102 A.2d 277.

Other circumstances have also led to the affirmance of convictions for automobile manslaughter based on sufficiency of the evidence. For example, in *Blackwell v. State,* 34 Md.App. 547, 369 A.2d 153 (1977), this Court found the evidence sufficient to sustain Blackwell's conviction when his vehicle struck from behind and killed a teenage girl on a bicycle. The evidence showed that, although Blackwell was not speeding, he had been drinking previously and he swerved back and forth from the shoulder to the roadway. Witnesses at the inn where Blackwell had been drinking prior to the accident testified that he appeared drunk. After the accident Blackwell fled the scene. 34 Md.App. at 548–49, 369 A.2d 153. Relying primarily on Blackwell's intoxication, this Court held: "When appellant voluntarily, if not intentionally, drank himself into a state wherein his nervous system was numbed, adverse-

---

**10.** The Court intimated that *"[t]hese factors of drinking and flight, which suggest at least an unwillingness to face an issue of intoxication, are entitled to some weight, although not controlling."* 211 Md. at 585, 128 A.2d 634 (emphasis supplied).

ly affecting his reflexes, coordination, discretion and judgment, to drive an automobile thereafter itself constituted a wanton or reckless disregard for human life." *Id.* at 565, 369 A.2d 153.

## 2.

### Conviction for Automobile Manslaughter Reversed

To date, only two reported opinions have resulted in a reversal of automobile manslaughter convictions based on insufficiency of the evidence. Both of those cases were decided by the Court of Appeals some forty years ago. Despite the fact that reversals are small in number as compared to affirmances of such convictions, and despite the age of the two reversals, we find those cases particularly instructive given the situation in the case at bar.

*Thomas v. State,* 206 Md. 49, 109 A.2d 909 (1954), was the first of the two reversals. In that case, Thomas was driving a truck during the course of his employment, accompanied by two other individuals. Thomas admitted that throughout the course of the day he had consumed some six beers. Immediately prior to the accident Thomas was operating his vehicle in a prudent manner, traveling at approximately 30 miles per hour. When approaching an elementary school crossing, Thomas shifted his truck into a lower gear so to slow the vehicle to some 20 miles per hour. After passing the school crossing zone, Thomas shifted back into a higher gear to a speed of 30 to 35 miles per hour. The road configuration at that point consisted of an incline, at the top of which was a sharp turn to the right. Once the turn is made a steep decline leads to a bridge. The speed limit is 30 miles per hour. Thomas, on approaching the sharp turn, was still operating his vehicle in a normal manner. He took his foot off of the accelerator and "touched the brake" while making the turn. At that point, however, witnesses testified that the truck "dashed" or "darted" to the left. Although Thomas tried to regain control of the vehicle, he was unable to do so. Two boys who were walking in the right lane of traffic on the

bridge were directly in Thomas's path. Thomas attempted to avoid hitting the boys by turning his vehicle to the left and hitting a guard rail instead of the children, but the children ran in the same direction as the oncoming vehicle, and both boys were killed as a result. There was also testimony that, approximately two weeks prior to the accident, the truck had received brake repairs, but, according to Thomas, the brakes still did not function properly. 206 Md. at 52–54, 109 A.2d 909.

The Court of Appeals first commented:

> This rather full view of the evidence shows that there were only three factors from which gross negligence might be deduced: (1) excessive speed; (2) defective brakes; and (3) intoxication. As we understand the observations of the learned trial judge at the conclusion of the testimony, he based his finding of gross negligence on the last ground.

*Id.* at 55, 109 A.2d 909. The Court, however, found none of the three factors led to a proper conviction of automobile manslaughter. First, the Court noted, there was no substantial evidence of excessive speed that would rise to the level of gross negligence. *Id.* at 56, 109 A.2d 909. Second, the defective brakes did not amount to gross negligence since Thomas reported the unsatisfactory condition of the brakes but was ordered to continue using the vehicle until it received further repairs. *Id.* Third, the Court was unpersuaded by the trial court's reliance on intoxication to establish gross negligence:

> Not one witness testified that he appeared to be intoxicated, the police made no tests to determine whether or not he was at all under the influence of alcohol and no such charge was made in the proceedings before the Trial Magistrate.... No testimony at all, either general or specific, was offered to show what the intoxicating effect of six bottles of beer consumed over the time here involved would be.

206 Md. at 57, 109 A.2d 909.

In conclusion, the Court of Appeals held:

> We think the testimony as to how the defendant was driving just before reaching the top of the hill and the curve down

to the bridge, as to the erratic operation of the brakes, as to the appellant's efforts to regain safe control of the truck after its unexpected apparent reaction to a touch of the brakes, and as to his reasons therefor, and as to his last desperate effort to avoid running into the boys by trying to run the truck into the bridge wall also tend to negative a belief that he was intoxicated.

*Id.* at 57, 109 A.2d 909. Accordingly, the Court in *Thomas* was unable to find the requisite mental state of gross negligence, and the judgment of the trial court was reversed.

Three years after *Thomas* the Court of Appeals once again reversed a conviction of automobile manslaughter in *Johnson v. State*, 213 Md. 527, 132 A.2d 853 (1957). At 1:50 a.m. in Baltimore City, Johnson was operating his vehicle on a four-lane northbound highway. While navigating a turn Johnson struck a curb, sideswiped a light pole, and lost control of the vehicle. The passenger was thrown from Johnson's vehicle and died as a result of injuries sustained in the collision. Johnson admitted to having consumed two beers during the eight hours prior to the accident. He said that he lost control because while making the turn his vehicle struck a bump caused by railroad tracks that crossed the street. At trial, Johnson was convicted based on the theory that he was traveling at an excessive rate of speed and therefore unable to control his vehicle. 213 Md. at 529–31, 132 A.2d 853.

The Court of Appeals, however, found insufficient evidence for a conviction. The Court noted that although the speed may have been enough to establish negligence, it did not give rise to gross negligence. Furthermore, given the nature of the environment, *i.e.,* a solely commercial area with light traffic late in the night, and no other signs of traffic violations, the conviction could not stand. 213 Md. at 532–33, 132 A.2d 853.

## D.

### The Case at Hand

■ Our review of the relevant case law in Maryland leads us to only one conclusion—the appellant's conviction in the

case at bar cannot stand. In all of the cases in which automobile manslaughter convictions were affirmed, the drivers of those vehicles engaged in numerous actions that could lead to a rational inference of a wanton or reckless disregard for human life. Engaging in a drag race, failing to stop for a stop light or stop sign, driving on the wrong side of the road, all exhibit some degree of indifference to human life. Such actions, especially when coupled with other factors such as the consumption of alcohol, excessive speed, or flight, support a finding of gross negligence and hence support a conviction for manslaughter by automobile.

In the case at bar, however, there is no evidence of the consumption of alcohol. We do not have excessive speed. In fact, Mr. Hawkins testified that when approaching the school area the appellant's vehicle actually slowed down. If anything, that fact leads to an inference that the appellant was attempting to operate his vehicle in a careful and prudent manner. The only evidence we have of "erratic driving" is that the appellant "drifted" onto the shoulder and subsequently the curb of the road for only a few seconds. Again, Mr. Hawkins testified that he noticed nothing unusual about the appellant's vehicle immediately prior to the accident, and but for the few seconds that the appellant's vehicle left the roadway, there were no other signs of negligent operation of the vehicle.

The State relies heavily on the fact that the accident occurred in a school zone and that the appellant, because he failed to maintain a proper lookout in such an area, was therefore grossly negligent. We disagree. We do not dispute that the accident occurred in a school area where children had just been dismissed for their Christmas vacation, but, as previously noted, the appellant seemed to take due regard of that fact when he slowed his vehicle on approaching the school.

Furthermore, the fact that the appellant did not respond to Mr. Hawkins beeping his horn and flashing his high beams does not support a finding of gross negligence. The lack of a

response from the appellant could have several rational explanations: the appellant could have been unaware that Mr. Hawkins was trying to get his attention, but rather thought Mr. Hawkins was beeping at the children or at another car; the appellant may not have heard the horn of the vehicle, as Mr. Hawkins testified that the appellant's windows were up at the time; the appellant may not have seen the high beams as it was daylight; or, the appellant may have simply chosen to ignore the lights and horn because he did not know Mr. Hawkins and did not want to stop.

It is also uncontested that the appellant fled the scene after the accident. Granted, flight is a factor to consider, but given the fact that the only evidence of irregular driving was the appellant's brief drift to the shoulder and the curb, flight from the scene cannot support a finding of gross negligence. Indeed, testimony was elicited at trial that the appellant made a U-turn and returned to the scene, where several adults were tending to the victim. Therefore, the appellant's choice not to stop and render aid, while morally inexcusable, may have amounted to no more than the manifestation of his own fright and disbelief. We do not think that such flight, under the circumstances, demonstrates that the appellant cared so little about what he had done as to render him grossly negligent. In fact, the appellant seemed all too sorry for his actions (albeit too late) when, on Christmas day, he turned himself in to the authorities and told officers that he wished he were dead. Although the State, incredibly, suggests that those remarks by the appellant evidenced only his concern for himself, we find to the contrary. Obviously, the appellant was distraught over what had occurred.

Finally, although there were no skid marks, an officer testified at trial that the absence of skid marks did not necessarily mean that the appellant did not apply his brakes. Therefore, the absence of skid marks was not conclusive.

In sum, all of the evidence that we have in the case at bar is that the appellant momentarily drifted onto the shoulder of a road, up a sloped curve only approximately 3 inches in

height, and unfortunately, took the life of a little girl. The reason for the appellant's departure from the travel portion of the roadway is and forever will be unknown. He may have dozed off at the wheel; he may have been changing the radio station; he may have been reading directions; he may have spotted something across the street that caught his attention. That he should have paid 100% attention to the roadway in front of him is without question. Nevertheless, his brief lack of attention, even though it resulted in sheer tragedy, was not of such "extraordinary or outrageous character" as to rise to the level of gross negligence capable of sustaining a conviction for automobile manslaughter.

█ Similarly, we find the evidence insufficient to sustain the appellant's conviction of reckless driving.[11] That offense, like automobile manslaughter, incorporates a similar mental state of a "wanton or reckless disregard for the safety of persons or property." [12] As we have already explained, *supra*, there was insufficient evidence of gross negligence in the instant case to support a conviction of automobile manslaughter. Similarly, we do not believe that a rational trier of fact could have found that the appellant's actions amounted to a

---

**11.** Md.Code Ann., Transp. § 21–901.1 provides, in pertinent part:

> (a) *Reckless driving.*—A person is guilty of reckless driving if he drives a motor vehicle:
> (1) In wanton or willful disregard for the safety of persons or property; or
> (2) In a manner that indicates a wanton or willful disregard for the safety of persons or property.

**12.** In *Taylor v. State, supra,* we explained the subtle distinction between the mental states in automobile manslaughter and reckless driving:

> The contrast between the two offenses is evident. Although "wantonness" may be a common element, the object of the disregard is different. The disregard required under art. 27, § 388 must be "for human life." The disregard required under § 21–901.1(a) may be for less than that—for the "safety of persons or property." Moreover, § 21–901.1(a) does not require a finding that the defendant actually harbored a wanton or willful disregard but permits a conviction on a finding that his manner of driving "indicates" such a disregard. These may be subtle nuances, but they are not unimportant.

83 Md.App. at 403, 574 A.2d 928.

"wanton and willful" disregard for human safety. The appellant's reckless driving conviction cannot stand.

In light of our reversal of the appellant's automobile manslaughter and reckless driving convictions, we remand the case to the Circuit Court for Montgomery County so that he may be sentenced for the remaining convictions that had been merged into the automobile manslaughter conviction.

**JUDGMENTS REVERSED; CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR RESENTENCING.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY.**