754 A.2d 1055

Frederick Henry HENSEN, Jr.,

v.

STATE of Maryland.

No. 880, Sept. Term, 1999.

Court of Special Appeals of Maryland.

June 30, 2000.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Jerry Barnes, State's Atty. for Carroll County of Westminster, on the brief), for appellee.

Submitted before DAVIS, THIEME and KRAUSER, JJ.

KRAUSER, Judge.

Appellant, Frederick Henry Hensen, Jr., and codefendant, Scott Drysdale Broadfoot, Sr., were convicted by a jury in the Circuit Court for Carroll County of manslaughter by automobile and second degree assault. Appellant presents the following issues for review, which we have rephrased:

1. Whether the trial court erred in failing to take remedial action when the prosecutor purportedly made a threatening remark to a State witness before that witness testified.

2. Whether the trial court erred in refusing to propound a voir dire question, requested by appellant, concerning pretrial publicity.

3. Whether the trial court erred "in refusing to instruct the jury that a driver, not involved in a collision with the victim, is guilty of manslaughter by automobile only if the nonstriking driver is involved in a race or speed contest."

4. Whether the evidence was legally sufficient to sustain appellant's convictions.

For the reasons that follow, we shall affirm.

## FACTS

At approximately 9:30 p.m. on June 1, 1998, three automobiles sped out of the parking lot of a Burger King restaurant and headed east on Route 140, between Finksburg and Westminster. The drivers were appellant, Mark Eppig, and, appellant's codefendant, Scott Drysdale Broadfoot, Sr. Traveling at speeds that substantially exceeded the speed limit, the three drivers weaved in and out of traffic as they played a deadly game of follow-the-leader. Five miles later, Eppig's vehicle spun out of control, crossed the median strip, and collided with a car traveling in the opposite direction, killing its driver, Geraldine Wu, and seriously injuring her daughter, a passenger in that car.

Before trial, Eppig pled guilty to manslaughter by automobile. He received a sentence of 10 years' imprisonment, with all but three years suspended, and work release in exchange for testifying against appellant and Broadfoot. At trial, Eppig testified that he, Broadfoot, and appellant drove out of the Burger King parking lot and quickly accelerated their vehicles to a speed of 80 miles per hour. He and Broadfoot were in the lead; appellant followed behind. About a half mile later, Eppig entered a U-turn lane to allow appellant and Broadfoot to pass him. He then sped after them at a speed of 80 to 90 miles per hour. He caught up with them at Sandymount Road, where all three stopped for a red light. When the light turned green, they "took off," accelerating to a speed of 80 to 90 miles per hour. After crossing Suffolk Road, Eppig's vehicle reached a speed of 100 miles per hour, passing appel-

lant and Broadfoot. Pulling in front of Broadfoot, however, he lost control of his vehicle, crossed the grassy median and collided with Mrs. Wu's vehicle.

Jeffrey Lauer, a Baltimore County Police Officer, was traveling east on Route 140 when he observed three automobiles, moving "at extreme high rates of speed," traveling "extremely close" together and weaving in and out of traffic. He identified, from photographs, Eppig's car and Broadfoot's car and stated that appellant's vehicle "resemble[d]" and was "similar" to the third of the three vehicles. "They stayed, more or less, as a pack-pack of three vehicles pretty much the entire time I saw them" up to the moment of the collision, he stated. He further testified that the maximum speed reached by the vehicles, before the collision, was "in excess of 90 miles an hour easy."

Trooper First Class John Rose of the Maryland State Police testified that the speed limit on Route 140 was 50 miles per hour at the Burger King and 55 miles per hour at the site of the collision. Qualified as an expert in accident reconstruction, Trooper Rose testified that Eppig was driving between 102 and 120 miles per hour when he lost control of his car, and was traveling at 82 miles per hour when he struck Mrs. Wu's vehicle.

Traveling eastbound on Route 140, Beth O'Connell observed three vehicles pass her shortly before the accident. The first two were traveling one behind the other at such an extreme rate of speed that it caused her to scream. The third vehicle was only a couple of seconds behind. It "came up on [me] so fast," she said. The vehicles passed her somewhere between Sandymount and Suffolk Roads. Two other motorists, James King and James Reiter, as well as Reiter's wife, Pamela, all of whom were traveling on Route 140 at the time of the collision, gave similar testimony as to the speed of the vehicles and their proximity to one another.

Angel Rivera, a passenger in appellant's car at the time of the accident, testified that, after leaving the Burger King, the three drivers were playing follow-the-leader, switching lanes

and positions, and jumping in front of other cars. He stated, however, that, at the time of the accident, appellant's vehicle was going only 65 miles per hour.

Appellant testified that he never reached a speed in excess of 75 miles per hour; that Broadfoot and Eppig were racing each other, but he was not involved; and that he was not "leapfrogging" other vehicles. Appellant further stated that his car vibrated at high speeds because of damage to his wheel, and that his car was performing sluggishly because of a timing problem.

Charles Pembleton, an expert in accident reconstruction and automotive systems analysis, was called by appellant to testify. He stated that the condition of appellant's car would not have permitted him to drive for five miles at a speed of over 85 miles per hour. He further stated that, based on appellant's testimony that he was traveling only 75 miles per hour and Trooper Rose's testimony that Eppig was traveling between 102 and 120 miles per hour, appellant's car was between .18 and .23 miles behind Eppig when Eppig lost control of his vehicle.

Wendell Cover, also an expert in accident reconstruction, was called by codefendant Broadfoot to testify. He challenged the methodology used by the State police in calculating the speed of the three vehicles. He stated that Eppig was traveling at a speed of 77 miles per hour immediately preceding the accident.

## DISCUSSION

### I

■ Appellant contends that the trial court erred in failing to take the remedial action requested by appellant when evidence that the prosecutor may have threatened a State witness came to light. Specifically, appellant argues that the trial court should have granted either appellant's motion to disqualify the threatened witness from testifying or codefendant's motion for a mistrial.

Before Angel Rivera, a passenger in appellant's car at the time of the collision, took the stand to testify for the State, the trial court conducted a hearing outside of the presence of the jury on the question of whether Rivera had been improperly threatened by the prosecutor. At that hearing, Rivera testified as follows:

Q: [BY THE COURT:] What did he say?

A: He said, "if you get on the stand and if" ... Can I say this word?

Q: You—you[.]

A: ...—if I fuck him over on the stand, that I'll pay for something—or, I don't know, something along those terms.

Q: So, you don't remember exactly what he said?

A: No, but it sounded like a threat.

Q: "If you get on the stand ... and you fuck with me[.]"

A: That's what he said.

Q: [W]hat—what next[?]

A: I wasn't even trying to even listen to the rest, I was walkin' away as he was saying that.

Q: And, what did he say about going on the stand and telling the truth?

A: Nothing. That's all he said was that comment, and then, as he was walking away, he said, "Don't fuck with me."

\* \* \*

Q: [BY DEFENSE COUNSEL:] Mr. Rivera, did you feel threatened by this remark?

A: Only about the aspect that he's way higher authority than I am in his position.

Q: Do you feel that if you testify in this case, you will be testifying, at least partly out of concern for whether you will be prosecuted for anything that you say?

A: No.

Q: Based upon what's been said to you, do you believe that your ability to testify as a witness fairly and impartially and based solely on the facts as you know them, has been harmed or injured or impaired in any way?

A: No.

The prosecutor then addressed the court:

THE PROSECUTOR: I would like to clarify what I said.

DEFENSE COUNSEL: I have no objection to a proffer.

THE COURT: Ple—please clarify what you—you said?

THE PROSECUTOR: What I said—my exact words to him was, "Mr. Rivera, if you fuck with me, you'll be sorry. All I want is the truth." And, he said, "You'll get the truth," and then we both walked away, and I asked for the truth, and that's all, and that's the extent of it, and he was walking—and he walked away and I walked away.

THE COURT: Do you recall whether you said a second time, "Don't f___ with me," or not?

THE PROSECUTOR: I—I might have said it a second time, it's very possible, but it wasn't—we were parting, we were walking separate ways.

After defense counsel declined the court's invitation to question the prosecutor further, the court denied defense counsel's motion to disqualify Rivera as a prosecution witness, stating:

> [B]ased upon the inquiry that I have made, the fact that all of this has taken place out of the presence of the Jury, persuades me that this will have no bearing on the process and based upon what Mr. Rivera has testified under oath and what [the prosecutor], as an officer of the Court has stated to me, I see no basis to, quote, "disqualify him as a witness," so the Motion to Disqualify him as a witness is denied.

■ However raw, crude, and unfortunate the prosecutor's remarks, they appear to have been intended to warn Rivera to tell the truth or face unspecified consequences. Admonitions to witnesses to tell the truth do not necessarily violate a

defendant's right to due process of law. Indeed, "the determination of whether prosecutorial admonitions violated the defendant's due process will depend on the facts in each case." *State v. Stanley,* 351 Md. 733, 747–48, 720 A.2d 323 (1998). As Rivera was not a defense witness but a State's witness, the prosecutor's threat was clearly not intended to "directly intimidate or coerce a witness into silence," a factor that the Court of Appeals, in *Stanley,* stressed was important in determining the propriety of such prosecutorial admonitions. *Id.* at 748, 720 A.2d 323. Indeed, there is no evidence that it was anything other than an unnecessarily crude warning to tell the truth. Moreover, Rivera testified that he did not feel any pressure to testify, that he did not fear prosecution based on his testimony, and that he believed that the prosecutor's statement had not affected his ability to testify fairly and impartially. The trial court thereupon concluded that there was "no basis to . . . disqualify him as a witness" and properly denied appellant's motion to disqualify and codefendant's motion for a mistrial. Parenthetically, we note that the trial court's denial of the motion for mistrial is not properly before us because appellant neither moved for a mistrial himself nor joined in Broadfoot's motion for a mistrial. *See Erman v. State,* 49 Md.App. 605, 612, 434 A.2d 1030 (1981).

## II

Because of the amount of pretrial publicity that attended this case, appellant requested that the trial court ask prospective jurors "whether anyone knows anything about this case and, if so, what?" While declining to ask that specific question on voir dire, the trial court propounded the following question regarding pretrial publicity:

Have any of you members of the jury, based on any discussions you've had around the-the dining room table or kitchen table, based upon any discussions you've had at work, based upon watching any television programs which may have reported about this case, or read any articles in the local or Baltimore paper about this case, formed an opinion which would affect your ability to sit as a juror,

recognizing that your duty as a juror is to be fair and impartial and to decide the case on the evidence?

Appellant argues that the trial court erred by failing to ask the question requested and by propounding a question which was, according to appellant, both "compound" and "complicated." We disagree.

 Initially, we note that "the scope of *voir dire* and the form of the questions propounded rests firmly within the discretion of the trial judge." *Davis v. State*, 333 Md. 27, 34, 633 A.2d 867 (1993) (citing *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627 (1958)). Moreover, "the trial judge's discretion regarding the scope of a proposed avenue of *voir dire* is governed by one primary principle: the purpose of 'the inquiry is to ascertain "the existence of cause for disqualification and for no other purpose." ' " *Davis*, 333 Md. at 34, 633 A.2d 867, (quoting *McGee v. State*, 219 Md. 53, 58, 146 A.2d 194 (1959)) (quoting *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556 (1952) (citations omitted)).

 In the instant case, the trial judge did not abuse his discretion. The question propounded by the court was neither "compound" nor "complicated" and its purpose was "to ascertain the existence of cause for disqualification," namely, any bias generated by pretrial publicity.

 It was not a compound question as it did not contain two distinct questions. On the other hand, interestingly enough, appellant's proposed voir dire question, which the court declined to ask, did contain distinct questions, leaving this Court more than a little curious as to why appellant raised this issue in the first place. Moreover, there is nothing inherently wrong with asking a compound question on voir dire. Appellant's reliance on Judge McAuliffe's concurring opinion in *Davis* for the contrary proposition is baffling. In that opinion, Judge McAuliffe declared: "The benefit of a compound question ... is to focus the prospective juror's attention on a specific circumstance that experience has shown is sometimes a disqualifying factor for a juror, without taking

the time to hear from each juror about his or her uncle, aunt, or sister. . . ." *Id.* at 54, 633 A.2d 867.

Nor was there anything complicated about the question propounded by the court. It was a straightforward question as to whether any of the prospective jurors had heard, read, or watched anything on television that had led them to form an opinion affecting their ability to be fair and impartial. And it appears from the record that they had no trouble in understanding the import of that question. Thirteen prospective jurors indicated that they had been affected by newspaper or other media coverage of the case and were thereupon excused from service on that jury. Finally, after interviewing each juror, the trial court asked: "Is there anybody who has some opinion or preconceived notion which would make it—make you unable to—to follow that instruction on the law if you're selected as a juror to sit as a juror in this case?" The trial court thus took extra precautions to insure that anyone who had been influenced by media coverage would be excluded from jury service in the instant case.

Citing *Bowie v. State*, 324 Md. 1, 595 A.2d 448 (1991), appellant contends that the trial court erred in failing to ask the follow-up questions requested by appellant because it left prospective jurors with the task of assessing their own ability to serve. Appellant's reliance on *Bowie*, however, is misplaced. There, the State indicated that it would seek the death penalty if the accused was convicted of first degree murder. During the voir dire examination, the trial court asked potential jurors whether any one "has any feelings whatsoever about such a request [for the death penalty], and I don't care which way you feel about it, that it would interfere with your ability to fairly and truly judge this matter based only on the evidence before the court?" *Id.* at 16, 595 A.2d 448. Prospective jurors who responded affirmatively to this question were then excluded. On appeal, however, the Court of Appeals held that by failing to inquire further as to the reasons underlying each juror's response, the trial court had abdicated its responsibility "to make the ultimate decision as to [each juror's] ability to serve on a capital sentencing

jury...." 324 Md. at 23, 595 A.2d 448. But the *Bowie* Court specifically limited the applicability of that holding, explaining:

> In the usual case, questions designed to elicit bottom line juror conclusions are often used in the *voir dire* process and actions taken by the court in response are appropriately upheld. In a death case, however, when they concern juror attitudes about the death penalty and whether a juror, because of those attitudes, will be able to serve, such questions are ordinarily inappropriate.

*Id.* at 24 n. 10, 595 A.2d 448.

■ As this is not a "death case" to anyone but the unfortunate victim, "questions designed to elicit bottom line juror conclusions," like the one at issue here, are appropriate.

### III

Appellant contends that the trial court erred "in refusing to instruct the jury that a driver, who was not involved in a collision with the victim, is guilty of manslaughter by automobile only if the nonstriking driver is involved in a race or speed contest." In other words, according to appellant, unless the nonstriking driver is involved in a race or speed contest, his conduct, no matter how negligent, does not rise to the level of "gross negligence," an essential element of manslaughter by automobile. We do not agree.

Maryland law defines the crime of manslaughter by automobile as follows:

> Every person causing the death of another as the result of the driving, operation or control of an automobile ... in a grossly negligent manner, shall be guilty of a felony....

Maryland Code (1996 Repl.Vol., 1999 Supp.), Article 27, § 388.

■ "Gross negligence" is the "wanton or reckless disregard for human life in the operation of an automobile." *Goldring v. State*, 103 Md.App. 728, 733, 654 A.2d 939 (1995); *Coates v. State*, 90 Md.App. 105, 113, 600 A.2d 856 (1992) (citing *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990)).

The trial court instructed the jury on the element of gross negligence as follows:

The second element the State must prove is gross negligence; that is, that the Defendant had a wanton or reckless disregard for human life in the operation of his automobile. The object for disregard must be human life and not merely safety—human safety or—or property. Speed alone is ordinarily insufficient, and the care required must be proportioned to the danger. This deals with his—his state of mind, and his conduct has to have been of such an extraordinary or outrageous character to imply that state of mind.

Only conduct that is of extraordinary or outrageous character will be sufficient to imply the state of mind of gross negligence. Simple negligence would not be enough.

Now, simple negligence is carelessness. It's defined in the law as the doing of some act that a person using ordinary care would not do, or not doing some act that a person using ordinary care would do.

Even reckless driving may not be enough to imply the state of mind of gross negligence. Reckless driving may be a strong indication, but unless it is of extraordinary or outrageous character, it ordinarily will not be sufficient.

Speed alone is ordinarily insufficient to prove gross negligence. Speed cannot be looked upon in a vacuum, but must be looked upon in light of all of the other factors and circumstances of the case. Let me illustrate the point with a hypothetical example which is totally unrelated to the evidence in this case. Speeding through a school zone in excess of the speed limit on a rural highway at 2:00 a.m. ordinarily would be insufficient to prove gross negligence. Speeding through the same school zone, however, in excess of the speed limit in the afternoon as school was letting out may be of such an extraordinary or outrageous character as to be sufficient to imply the state of mind of gross negligence.

You may consider the following factors in determining whether the Defendant's conduct rose to the level of gross

negligence: (a) racing or speed contest; (b) failing to keep a proper lookout; (c) failure to maintain proper control of the vehicle; (d) excessive speed under the circumstances; (e) flight from [the] scene without effort to ascertain extent of injuries; (f) failure and force of impact; (g) unusual or erratic driving prior to impact; (h) presence or absence of skid or yaw marks; (i) the injuries sustained and the damage to the vehicles; (j) the nature of the neighborhood environment and the type of highway where the accident occurred.

Appellant objected to that instruction, claiming that the instruction's definition of "gross negligence" was overbroad and that a nonstriking driver is guilty of manslaughter by automobile only if he was involved in a race or speed contest with the driver who actually struck the victim. Appellant's claim is without merit.

The factors enumerated in the trial court's instruction for the jury to consider in determining whether appellant's conduct rose to the level of gross negligence have been repeatedly approved by this Court. *See, e.g., Plummer v. State,* 118 Md.App. 244, 256, 702 A.2d 453 (1997), *cert. denied,* 349 Md. 104, 707 A.2d 90 (1998); *Boyd v. State,* 22 Md.App. 539, 550–51, 323 A.2d 684 (1974). The trial court's instruction was correct as a matter of law.

■ On the other hand, appellant's proposed instruction was an incorrect statement of the law. Racing is not and has never been a necessary element of gross negligence in a manslaughter by automobile case. The trial court was therefore under no obligation to give that instruction to the jury. *See Mack v. State,* 300 Md. 583, 479 A.2d 1344 (1984)(explaining that in determining whether the trial court should have given a requested jury instruction, an appellate court must determine whether the instruction is an accurate statement of the law).

## IV

■ Finally, appellant contends that "the evidence adduced below failed to prove that [he] caused the death of

Geraldine Wu or the injuries to" her daughter. He argues that "there is no evidence in the record demonstrating that any action by [him] caused Eppig to lose control of his vehicle and cross the median" because "there was no explicit agreement among anyone involved to engage in a race" and, at the time of the collision, appellant "had actually fallen back." The race, if there was one, was then between Eppig and Broadfoot, he contends.

■ The standard for determining whether there is sufficient evidence to support a conviction is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720 (1981) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Applying that standard, we find that the evidence was sufficient to support appellant's convictions.

■ It is well settled in Maryland that one who participates in a drag race may be convicted of manslaughter by automobile for the death of a third party, "regardless of which driver actually collided with the victim or the victim's vehicle." *Pineta v. State,* 98 Md.App. 614, 626, 634 A.2d 982 (1993); *see also Goldring v. State,* 103 Md.App. 728, 731–32, 654 A.2d 939 (1995).

■ Putting aside for the moment that, as noted earlier, one need not prove that a nonstriking driver was involved in a race to establish the gross negligence element of manslaughter by automobile, there is sufficient evidence that appellant was an active participant in an automobile race and that that race cost Mrs. Wu her life. Without recounting in detail the evidence adduced at trial, as that was done in an earlier part of this opinion, suffice it to say that five eyewitnesses testified that, immediately preceding the collision of Eppig's vehicle with Mrs. Wu's, the vehicles of Eppig, Broadfoot, and appellant were traveling at exceptionally high rates of speed, in proximity with each other, and weaving in and out of traffic. There was thus sufficient evidence from which the jury could

reasonably conclude that appellant was involved in a race that resulted in Eppig losing control of his vehicle and colliding with Mrs. Wu's automobile.

Appellant's contention that there was no evidence of an "explicit agreement" among the parties to race is puzzling. We assume that by "explicit" appellant meant "expressed" and, if so, we agree that no agreement to race was put into words. If, on the other hand, by "explicit" appellant meant "clear" or "definite," we disagree, as there was ample evidence that all three parties had agreed, albeit by conduct, to race each other only minutes before the fatal collision with Mrs. Wu's car.

In any event, even if the evidence fell short of establishing that a race had occurred, there was considerable eyewitness testimony that, immediately preceding the collision, appellant, Broadfoot, and Eppig were traveling at extremely high rates of speed, playing follow-the-leader, leapfrogging traffic, and jumping in front of other cars. As the Court of Appeals observed in *Palmer v. State*, 223 Md. 341, 353, 164 A.2d 467 (1960):

> It is not essential to the existence of a causal relationship that the ultimate harm which has resulted was foreseen or intended by the actor. It is sufficient that the ultimate harm is one which a reasonable man would foresee as being reasonably related to the acts of the defendant.

In the instant case, the death of Mrs. Wu and the serious injuries suffered by her daughter, though not intended by appellant, were reasonably foreseeable consequences of the acts of appellant and his friends.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**